Patrick Shannon                                          July 25, 2017

Page 107

1

2     Filed:   8/2/17

3

4          CHARLES BUTLER
           United States Department of Justice
5          PO Box 683
           Washington, DC 20001
6

7

8          NOTICE RE FILING OF ORIGINAL DEPOSITION

9          Case Name: USA v. Gould
           Venue:   USDC/WDW/Seattle
10         Cause:  No. 2:16-cv-1041-TSZ
           Witness:  PATRICK SHANNON
11         Taken: July 25, 2017

12              Enclosed is original sealed transcript of
      PATRICK SHANNON.

13
                Pursuant to CR 30(e), the original signature
14    page and changes, if any, received by this office
      will be forwarded to all counsel.

15

16

17

                _____
18              Margaret Walkky, CCR No. 2540

19

20

21

22

23

24    cc:     File
              JOHN COLVIN
25            AARON LUKOFF



Page 1

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

UNITED STATES OF AMERICA, )
      Plaintiff, )
   vs. ) No. 2:16-cv-1041-TSZ
DAVID A. GOULD; JANE C. )
POLINDER; BROOKLINE )
PROPERTIES, INC.; WHATCOM )
COUNTY TREASURER; TARIO )
AND ASSOCIATES, P.S.; )
WASHINGTON STATE )
DEPARTMENT OF SOCIAL AND )
HEALTH SERVICES; )
FINANCIAL CONCEPTS, LTD.; )
GOLDSTAR ENTERPRISES, )
INC., )
     Defendants. )

ORIGINAL

---

DEPOSITION UPON ORAL EXAMINATION

OF

PATRICK SHANNON

---

9:25 a.m.; July 25, 2017

700 Stewart

Seattle, Washington

REPORTED BY: Margaret Walkky, CCR, RPR, RMR, CRR

Court Reporter, License No. 2540



Patrick Shannon                                        July 25, 2017

                                                           Page 2

1                 A P P E A R A N C E S

2

3   FOR PLAINTIFF:        CHARLES J. BUTLER

4                         United States Department of

5                              Justice

6                         PO Box 683

7                         Washington, DC 20001

8                         202-514-6062

9                         charles.j.butler@usdoj.gov

10

11  FOR DEFENDANT POLINDER:

12                        JOHN COLVIN

13                        Colvin & Hallett

14                        719 Second Ave, Ste 1450

15                        Seattle, Washington 98104

16                        206-223-0800

17                        jcolvin@colvinhallettlaw.com

18

19  FOR WITNESS:          AARON M. LUKOFF

20                        Law Offices of

21                            Aaron M. Lukoff & Associates

22                        PO Box 1153

23                        Bellingham, Washington 98227

24                        360-647-5251

25                        aaron@lukofflegal.com

Patrick Shannon                                          July 25, 2017

                                                              Page 3

1                        I N D E X

2

3    EXAMINATION                                          PAGE

4    By Mr. Butler                              6, 95, 97

5    By Mr. Colvin                                        93

6    By Mr. Lukoff                                        96

7

8    EXHIBIT              DESCRIPTION                      PAGE

9    1        Of Brookline Properties, statement          29

10            of general trust manager, 5-12-98

11   2        Letter to Department of Revenue             32

12            from Ekhart, 5-12-98

13   3        Promissory note, $75,479.48, 4-15-04        38

14   4        Promissory note, $203,766.96, 1-20-06       46

15   5        Statutory warranty deed, 3-13-03,           57

16            lot 1, Shauna short plat

17   6        Statutory warranty deed, 3-13-03,           57

18            lot 2, Shauna short plat

19   7        Statutory warranty deed, 3-13-03,           59

20            lot 3, Shauna short plat

21   8        Baycor short plat                           59

22   9        Statutory warranty deed, 3-3-06,            62

23            lots 2 and 3, Baycor

24

25

Patrick Shannon                                                July 25, 2017

Page 4

| 1 | EXHIBIT | DESCRIPTION | PAGE |
|---|---------|-------------|------|
| 2 | 10 | Filing document, affidavit and | 63 |
| 3 |  | memorandum of security agreement, | |
| 4 |  | 8-29-12 | |
| 5 | 11 | Filing document, affidavit of | 66 |
| 6 |  | obligation, 2-13-09 | |
| 7 | 12 | Whatcom County District Court docket, | 73 |
| 8 |  | default judgment | |
| 9 | 13 | Articles of incorporation and | 75 |
| 10 |  | charter for Director of Deerbrook | |
| 11 | 14 | Letter to Shannon from Webber, | 79 |
| 12 |  | 7-17-00 | |
| 13 | 15 | Agreement and contract between | 83 |
| 14 |  | Canvasback Systems and Gould, | |
| 15 |  | 12-14-95 | |
| 16 | 16 | Copy of check, $1,075.48 payable | 85 |
| 17 |  | to US Bank Home Loans, 8-13-98 | |
| 18 | 17 | Treasurer's receipt, Whatcom County | 86 |
| 19 |  | Treasurer's Office, 10-18-99 | |
| 20 | 18 | Copies of three checks, $500 | 87 |
| 21 |  | each paid to US Bank Home Loans | |
| 22 | 19 | Copies of three Western Union | 88 |
| 23 |  | money orders, $500 each | |
| 24 | 20 | Customer's receipt, PNC Management | 89 |
| 25 |  | money order, $700 | |

Patrick Shannon                                                    July 25, 2017

Page 5

| | EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|---|
| 1 | | | |
| 2 | 21 | 2003 real property tax receipt | 89 |
| 3 | 22 | Letter to Shannon from Whelpley, | 90 |
| 4 | | 11-29-04 | |
| 5 | 23 | Loan agreement between Polinder and | 91 |
| 6 | | Shannon, 5-3-06 | |

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Patrick Shannon                                          July 25, 2017

                                                              Page 6

1    PATRICK SHANNON,           witness herein, having been

2                               first duly sworn on oath,

3                               was examined and testified

4                               as follows:

5

6              E X A M I N A T I O N

7    BY MR. BUTLER:

8              Q.   Good morning, Mr. Shannon.  Could you

9    please state and spell your name for the record and

10   then state your address.

11             A.   Patrick Shannon, P-A-T-R-I-C-K,

12   S-H-A-N-N-O-N.  Address is 5353 Olson Road in

13   Ferndale, Washington.

14             Q.   Thank you.

15             Charles Butler with the United States

16   Department of Justice, and I represent the United

17   States in this matter.  We're here on US versus David

18   Gould, et al, pending in the US District Court for

19   the Western District of Washington.  The deposition

20   is being conducted pursuant to the Federal Rules of

21   Civil Procedure.

22             Could I please ask your attorney to

23   state his appearance?

24             MR. LUKOFF:  My name is attorney Aaron

25   Lukoff.  My name is spelled A-A-R-O-N, last name

Patrick Shannon                                          July 25, 2017

1    L-U-K-O-F as in friendly, F as in friendly.

2                    MR. BUTLER:  Thank you.

3                    Mr. Colvin, could you please state your

4    appearance.

5                    MR. COLVIN:  John Colvin representing

6    Jane Polinder.

7            Q.    The court reporter is transcribing

8    everything we're saying, so please state your answers

9    verbally.

10            A.    (Nods head.)

11            Q.    And only one person can speak at a time

12   so please wait for me to finish my question before

13   answering.  If you don't understand my question, let

14   me know and I'll clarify or rephrase.

15                    Your attorney may object to a question,

16   but if he does, you still need to answer unless he

17   instructs you not to because doing so would reveal

18   privileged information.

19                    If you need a break at any point,

20   please let me know, but we can't break while a

21   question is pending.

22                    You understand that you were

23   administered an oath by the court reporter today and

24   are testifying under penalty of perjury?

25            A.    Yes, sir.

Patrick Shannon                                July 25, 2017

Page 8

```
 1            Q.   Are you under any medication or other
 2    substance, would you have any medical condition that
 3    would affect your ability to testify truthfully
 4    today?
 5            A.   No, sir.
 6            Q.   So you did receive the subpoena issued
 7    by the United States, correct?
 8            A.   Yes, sir.
 9            Q.   And you brought documents with you,
10    correct?
11            A.   I did.
12            Q.   Did you do anything else to prepare for
13    the deposition today?
14            A.   Other than talk to my attorney to make
15    sure that I knew what I was doing, no.
16            Q.   Did you speak with anyone else?
17            A.   No.
18            Q.   When was --
19            A.   My wife.  My wife knows that I'm here.
20            Q.   Okay.  You did not speak with Jane
21    Polinder about this deposition?
22            A.   No.
23            Q.   You did not speak with David Gould?
24            A.   I haven't talked to David in years.
25            Q.   Okay.  I just want to go over some
```

Patrick Shannon                                      July 25, 2017

                                                          Page 9

1    general background information on you.  Did you

2    graduate from high school?

3              A.    No.

4              Q.    Did you attend high school?

5              A.    Yes.

6              Q.    Where?

7              A.    High school for me would have been in

8    Burns Lake, British Columbia, Canada.

9              Q.    You came to the United States at some

10   point?

11             A.    Right, I was born in the states.  My

12   parents immigrated to Canada.  I finished my

13   schooling as far as it went in Burns Lake and then I

14   shortly thereafter came back to the states.

15             Q.    Do you have any post-high school

16   training?

17             A.    I do.  I have a lot of college credit

18   hours and most recent one was at Whatcom Community

19   College, I'm a paralegal.

20             Q.    When did you complete that training?

21             A.    Within the last two years.

22             Q.    What other kind of training have you

23   had other than the paralegal training post-high

24   school?

25             A.    I served four years active duty in the

Patrick Shannon                                    July 25, 2017

1    Marine Corps.  As far as official training, that's

2    it.  I work on a little piece of property in Ferndale

3    and I grow apple trees, nothing really too big to

4    write home about.

5            Q.   When were you in the Marine Corps?

6            A.   I went in in 1985.  I EAS'd in 1989 and

7    then I served a little bit of time in the reserves

8    before they released me on medical.

9            Q.   After you got out in '89, did you work?

10           A.   Yeah.  I tried to get a job in law

11   enforcement in Austin, Texas because that's where I

12   moved to after the military, and in that process my

13   mom needed help up here in Bellingham and I gave up

14   that and came to Bellingham to help her.

15           Q.   You helped her in what capacity?

16           A.   She had started a company called 3R

17   Industries and she needed me to basically oversee her

18   production with a company called -- geez, what was

19   it?  There's a packaging company, I can't remember

20   the name of it.  There was a packaging company and

21   she wanted me to make sure that the packages were

22   packaged and shipped out, so that's what I did.

23           Q.   And you came up to Bellingham to assist

24   your mother with 3R Industries?

25           A.   Yeah.

Patrick Shannon                                    July 25, 2017

Page 11

1          Q.   Approximately when was that?

2          A.   I think I moved up in '90, spring of

3    '90.

4          Q.   What kind of company was 3R Industries,

5    what was its purpose?

6          A.   She had a patent on a plastic part that

7    she was producing and packaging for the automotive

8    after market.

9          Q.   So what did you do with 3R Industries

10   at first?

11         A.   Just made sure that the production was

12   done at the place that she had designated to do the

13   production, and make sure that the shipments went

14   out.

15         Q.   How long were you doing that?

16         A.   Until the company went out of business,

17   early 2000s.

18         Q.   And in the 1990s, did you have any

19   other occupation?

20         A.   When I first moved here, I did a little

21   bit of construction work for Callen Construction,

22   maybe a year, possibly two.  Yeah, that's pretty much

23   what I did.  My wife works as -- was working for the

24   police department, so pretty much our family was kind

25   of reversed of everybody's.  I was the stay-at-home

Patrick Shannon                                    July 25, 2017

Page 12

1    mom and she was the one that went to work.

2            Q.   When did you work for Callen

3    Construction, approximately?

4            A.   When we first moved up here, I got a

5    job with them.  It would be sometime in 1990 and for

6    some time after that, a year, year or two after that.

7            Q.   When did you first meet David Gould?

8            A.   I'm not really positive.  '92 maybe,

9    '93 maybe.  I'm not really sure.

10           Q.   How did you meet him?

11           A.   I met him in an electronic stores in

12   Bellingham.  I believe he was buying a computer, I

13   was buying a computer.  A conversation started and I

14   would have to say that the relationship at that point

15   was an acquaintance.

16           Q.   Did it develop into something other

17   than an acquaintance at some point?

18           A.   At some point, it did.  My family and I

19   were never, they weren't friends enough that we would

20   like go to dinners or anything like that.  It was

21   more or less every now and then that he would need

22   something, and I was able and capable of doing it so

23   I would do it.

24                If he needed me to help him on a, you

25   know, repair on his house, he used to live in

Patrick Shannon                                      July 25, 2017

1    Bellingham down on the east side of Bellingham, and I

2    could help him.  I know how to build houses and work

3    on stuff.  So that it was kind of that relationship

4    for quite a while, not anything really more than that

5    for quite some time.

6              Q.   So approximately when was it when you

7    started helping him on things like what you just

8    described?

9              A.   Well, you know, I didn't have a lot

10   going on, so probably from the get-go, you know, he

11   probably plumbed my knowledge of what I knew and then

12   he would use me to do stuff.  Not so much as in hey,

13   I want you to come over and do this and I will pay

14   you, I don't think I ever got paid for doing

15   anything.  It was more or less he needed help and I

16   would help him fix things, build things.

17              And that eventually morphed into at

18   some point he asked me if I was interested in, you

19   know -- he was kind of a whack job.  He was kind of

20   on the right side of the right wing hanging off the

21   earth by his claws, and he kind of would -- took

22   quite a few years, took quite a while to talk me

23   into, he needed somebody to help protect his wife and

24   his kids.  He had a trust and wanted to know if I

25   wanted to be his trustee.  I think that's probably

Patrick Shannon                                    July 25, 2017

Page 14

1    where this is all going, and at the time, I didn't

2    know really what that involved.  I know now.  That

3    was dumb.

4              Q.   So it was approximately 1992?

5              A.   '92-ish, yeah, I think.

6              Q.   And then he would ask you to fix things

7    or help build things?

8              A.   Yeah, you know, his family and my

9    family, a wife with some kids, and he was always the

10   business guy.  He was always out doing things.  He

11   was always too busy for anything, and so if there was

12   something minor that needed done or he needed to

13   plumb my mind about how to do something, then he

14   would ask me and I would go help him.

15             Q.   And that was, for how many years were

16   you doing that?

17             A.   Really honestly unsure.  Couple, two or

18   three, probably, before anything else came out of

19   that.

20             Q.   By "anything else," you're referring to

21   when he asked you to be a trustee?

22             A.   Right.  I think the appeal of David is

23   he was always trading -- he was a day trader and I

24   was trying to find something I could do at home.  And

25   so he was always talking about day trading money or

Patrick Shannon                                                    July 25, 2017

 1    later that turned into forex, he was doing other

 2    things prior to that, other kinds of trainings.

 3            Q.    When you say he was a day trader, you

 4    mean he was trading in stocks?

 5            A.    I think, you know, initially I don't

 6    really know what he was trading.  He talked a lot

 7    about commodities, a whole bunch of stuff I really

 8    didn't know because I don't have any investments

 9    myself, so I don't do that.  And at the time, I had

10    no idea what it was, but it sounded intriguing.

11            And he was always talking about he was

12    always making money doing it and he was doing it at

13    home, and I was always at home so I thought that that

14    was his appeal to me.  I could find something to do

15    at home.  So I started listening to what he was doing

16    in that regard.

17            Q.    And this was in the '90s?

18            A.    Yeah.

19            Q.    When did he become involved with forex?

20            A.    Truthfully, I have no idea.  I know

21    that his investment, the way he did things morphed

22    over time.  He was always talking about the next big

23    thing, the next big score, the next big, you know, if

24    you do this, you're going to make that much money on

25    it, there's a special kind of return on this kind of

Patrick Shannon                                    July 25, 2017

Page 16

1    investment.  I never really had that money to invest.

2          Q.    How did you know he became involved

3    with forex?

4          A.    Shortly before I basically told him to

5    take flying leap, he was heavily involved in forex.

6    I don't know where he got the money from.

7          Q.    How do you know that, did he tell you?

8          A.    Yeah, straight up.  He had it in his

9    house in Ferndale, the house Jane lives in, he had a

10   TV screen bigger than this one, and he would always

11   have forex stuff on the screen.  I was intrigued.  I

12   was trying to figure out how he did that.  I never

13   could make money at it.  I tried paper trading for

14   two years trying to make money and I never made a

15   damn dime on it.

16         Q.    When was that, when he was involved

17   with forex?

18         A.    I don't have a year specifically, early

19   2000s probably.

20         Q.    What is forex?

21         A.    Foreign currency exchange.

22         Q.    So how was he involved?

23         A.    He traded it.  You log in.  You get a

24   program, I can't remember the name, the meta trader

25   or something, meta trader program, and you create

Patrick Shannon                                    July 25, 2017

1    your -- -- for me, I created a fake account you could

2    paper trade.  He had an account with real money in it

3    and I would watch what did he to try to duplicate

4    what he did, and so I was trying to learn how to

5    trade forex.

6              Being new to that kind of thing, I had

7    -- no way my wife would let me turn loose some money

8    to go do it.  So I figured I had to do it for a while

9    paper until I got good enough that I could show her

10   that I could make money at it.  The end result was

11   there was unless you're a market maker, you're not

12   going to make anything on that.

13        Q.   So it would involve purchasing and

14   selling foreign currency?

15        A.   Yeah, I think that's what he was doing.

16   That's exactly what forex is, trading between two

17   currencies.  You know one is going to go up, one is

18   going to go down, making a guess as to which

19   direction it was going to be.

20        Q.   When did you first meet Jane Polinder?

21        A.   On the day I met David or shortly

22   thereafter.  She was married to him at the time, and

23   I think they had one, if not two kids at the time,

24   two little girls.  They were babies at the time.

25        Q.   How well would you say you came to know

Patrick Shannon                                    July 25, 2017

Page 18

1    Mr. Gould and Ms. Polinder?

2         A.   I came to know David more than Jane.

3    Like I say, David was pretty far out there and it

4    became apparent over time he was one of them people

5    that would just suck your time until there was

6    nothing left of you to suck out.  So I never -- as a

7    family, we never hung out with them much.  I hung out

8    with David more than my wife and I hung out with

9    them.  And eventually that tapered off to the point

10   that I couldn't stand him to be around.

11              Because he was doing stuff that I was

12   supposed to at the time be the trustee on his trust

13   to protect the beneficiaries of the trust.  I never

14   had any control of his trusts.  So if I can't have

15   control and I can't have money and I can't have

16   access to accounts and I can't do a thing that I've

17   read trustees are supposed to do, then I am not

18   interested in being his straw man, because that's

19   really what it boiled down to.  He was not doing

20   anything that was beneficial to his family.

21         Q.   You said that David Gould and Jane

22   Polinder were married?

23         A.   I assumed they were.  They lived

24   together.  They had kids together.  I don't think

25   there was ever a question between my wife and I

Patrick Shannon                                          July 25, 2017

Page 19

1    whether or not we saw a marriage license.

2         Q.   After you met them, did you have

3    opportunities to observe their interactions with one

4    another?

5         A.   Oh, yeah.  Me more than my wife and I.

6    I would have to characterize that as he was in charge

7    and she would take care of the kids.

8         Q.   Why do you characterize it like that?

9         A.   Because many times that's what he would

10   tell her to do:  I'm busy.  You need to go take care

11   of the kids.  I'm busy.  You should go do this.

12   Don't bother me with that.  That's not something I

13   need to be doing.  You should be doing that.

14        Q.   Did you know Jane Polinder's father,

15   Gerald Polinder?

16        A.   I have met Gerald.  I can't say that I

17   know him.  I have met him.

18        Q.   When did you meet him?

19        A.   It would be early on, maybe mid '90s,

20   '94, '95.  I'm guessing entirely.

21        Q.   Do you remember the occasion when you

22   met him, like how you met him?

23        A.   I think there was a birthday party or

24   there was some occasion that was important to her

25   family and we were invited, and it was one of them

Patrick Shannon                                    July 25, 2017

Page 20

1    things we could take or leave.  And that day we

2    didn't have nothing to do, so we went and I think he

3    lived in Lynden at that time and so we were there

4    probably at her mom's house for maybe a couple of

5    hours.

6            Q.   Did you ever engage in any business

7    with Gerald Polinder?

8            A.   No.

9            Q.   You also met Jane Polinder's mother?

10           A.   Yeah.

11           Q.   That one time --

12           A.   That one time, yeah.  No, actually, I

13   betcha I've seen her at Jane's -- David and Jane's

14   house.  I'd probably seen her there, but not enough

15   to do anything more than say hi.  I mean, she's

16   there, she's in their house.

17           Q.   From in the early 2000s, say, from 2000

18   through 2005, do you know what David Gould's source

19   of income was?

20           A.   I would have to assume it was Shauna

21   short plat.  I don't know for sure.  The Shauna short

22   plat was the piece of purchase order around where his

23   house set and he had had it subdivided, I want to

24   say, into five lots including -- to not include his

25   house.  So a total of six lots.

Patrick Shannon                                    July 25, 2017

1          And I think, you know, I think his goal

2    was that he was going to get them improved, which was

3    -- which I think is sidewalks and power and sewer

4    connections, and then sell them off or build them

5    out.  If he had another source of income, I have no

6    idea.  I assume people gave him money to trade.  I

7    don't know.

8          Q.    How was he receiving money from Shauna

9    short plat, from renting?

10         A.    No, from selling.

11         Q.    Selling?

12         A.    Selling the lots.

13         Q.    Okay.

14         A.    Ostensibly I was supposed to be the

15   trustee to protect that, but I never had any power to

16   do that.  So when, you know, when he would want me to

17   go sign paperwork and I didn't have any control over

18   where it was going, I mean, that was the end our

19   relationship because of that kind of stuff.  But, you

20   know, I don't know where he got any other money.  I

21   assumed his family had money.

22         They lived in Costa Rica for a while.

23   I don't know why they left the country to go to Costa

24   Rica, but I took care of their main house and made

25   sure there were renters that he had picked to stay in

Patrick Shannon                                July 25, 2017

1    the house, and basically my job was to make sure that

2    the toilets flushed and the doors locked.

3              Q.    What time frame was that when you were

4    in Costa Rica and you were taking care of those

5    issues with respect to the house?

6              A.    I think it was right after Y2K.  He was

7    really freaked out.

8              Q.    For how long?

9              A.    I think he lived down there nearly a

10   year.  Actually, he was down there before that.  So

11   when the towers fell, he was in Costa Rica.  So he

12   had been down there probably three or four months, it

13   seems in my memory, before that happened, because he

14   called me from Costa Rica and told me to watch the

15   news because I had no idea what was going on.

16             Q.    Jane Polinder and the kids were with

17   him at that time?

18             A.    Yes.

19             Q.    They were there for another year after

20   that?

21             A.    I think they were there, if my memory

22   serves me, right around a year.  I don't have any

23   written records that say otherwise.  I'm going by old

24   memory.

25             Q.    At the time they were renting the

Patrick Shannon                                         July 25, 2017

Page 23

1    property at 6109 Evergreen in Ferndale?

2              A.    Yes.

3              Q.    Do you know if they had other rental

4    properties?

5              A.    They did have one in Bellingham.  I

6    don't remember the address.  It was a -- I want to

7    say it was a duplex.  I could be wrong.  And there

8    was a renter in that, yeah.  So I think there were

9    two, the one in Ferndale and the one in Bellingham.

10             Q.    The property at 6109 Evergreen in

11   Ferndale, is that the same as the property at 2450

12   Thornton Road?

13             A.    I think before it became the Evergreen

14   address, it was the Thornton Road address, because

15   the Shauna short plat was a bunch of empty lots with

16   the house in the middle of it, and during the

17   process, that house used to have a driveway that went

18   to Thornton Road.  And after he sold the front two

19   lots off on Thornton Road, they had to put a driveway

20   into Evergreen.  They couldn't cross the lots.

21             Q.    Okay.

22             A.    I think.  That just seems logical.

23             Q.    Do you know if David Gould ever worked

24   for Analistude, A-N-A-L-I-S-T-U-D-E, Capital?

25             A.    I don't know what that is.

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

Patrick Shannon                                    July 25, 2017

Page 24

1          Q.    Do you know if David Gould ever had a
2    professional attorney license?
3          A.    Oh, fuck no.   Sorry.   No.
4          Q.    In the same time period, 2000 to 2005,
5    do you know what Jane Polinder's source of income
6    was?
7          A.    I would have to assume her source of
8    income was either money from her parents or what
9    allowances she was given from Dave.
10          Q.    So you're not aware of her during that
11    time period working?
12          A.    Not outside the home or doing anything
13    outside the home.   I was not aware of any of that.
14    If she did, I didn't know it.
15          Q.    Apart from travel to Costa Rica, do you
16    know if David Gould otherwise traveled?
17          A.    Maybe to Canada.   What he would do up
18    there, I don't know, but, you know, he always seemed
19    to be around.   He always seemed to be talking to
20    people in other locations.   He was always basically
21    bragging up who he knew and where he knew, and those
22    were people I didn't know so it didn't really matter
23    to me.   I know that after I cut ties with him, it was
24    sometime after that he just fled and left.   He went
25    to China, is the last I knew.

Patrick Shannon                                    July 25, 2017

Page 25

1          Q.   When was that?  When did you cut ties
2   with him?
3          A.   Probably in the middle of all of that
4   retitling and buying or selling them lots off when I
5   didn't have control.  I couldn't even pay property
6   taxes.  I couldn't do what I was supposed to be
7   doing.  So in the middle of the Shauna short plat
8   lots being sold off, I'm pretty sure it was around
9   that time.  I don't know, I didn't keep records of
10  those conversations.
11         Q.   So approximately when was that?
12         A.   It would have to have been probably
13  early 2000s sometime, 2000, 2004, '05.  I don't know,
14  I don't know for sure.  I could ask my wife.  She
15  might know better.  She's kind of got a head for the
16  dates.
17         Q.   The early 2000s or even in the 1990s,
18  do you know, were you aware of Jane Polinder
19  traveling at all apart from the Costa Rica?
20         A.   The one trip to Costa Rica, no.  I
21  mean, I know she was there and her kids were there.
22  I think they were staying at his mom's place down
23  there.  His mom has a place in Costa Rica in some
24  enclosed, you know, gated community.
25         Q.   Do you know anything about David

Patrick Shannon                                          July 25, 2017

Page 26

1    Gould's involvement with tax avoidance organizations?

2              A.    Oh, boy.   Yeah, he's involved with

3    every one of them.

4              Q.    How were you aware of that?

5              A.    Because he kept trying to foist it off

6    as that was the best thing to do.

7              Q.    Do you know any specific groups he was

8    involved with?

9              A.    There was a guy who was -- what's the

10   hell is the name?  Anderson Ark, he was part of

11   Anderson Ark.  What the hell is it -- he got my mom

12   into one of these Ponzi investment schemes, I can't

13   think of the guy's name.  It was a group out of

14   Texas, fricking stole her money.

15             Q.    Approximately when was that?

16             A.    It was prior to the 2000s, I'm pretty

17   sure.

18             Q.    When did you first become associated

19   with Brookline Properties?

20             A.    That's when he was building those or

21   building or improving them lots.  I don't know the

22   date that I was first associated with that.  That was

23   his company, so --

24             Q.    How did it come about you being

25   involved with Brookline?

Patrick Shannon                                    July 25, 2017

Page 27

1          A.    Without remembering exactly, it was my
2     understanding that Brookline was the company he was
3     using, along with Canvasback Systems, to manipulate
4     the system.  You know, he had two companies and one
5     was the construction side and one was the money side.
6     I don't -- I think Brookline Properties is the one
7     that was the trust and it was supposed to be the one
8     holding title, and the beneficiaries I think were
9     supposed -- were for sure Jane and the kids.  But I
10    remember '90 something, '98-ish, something like that.
11    It's on that, one of these documents you took a copy
12    of there.
13         Q.    All right.  So how is it you became
14    involved?
15         A.    He initially -- adamantly thought that,
16    you know, his excuse was he wanted an arms length
17    relationship with a trustee and that's how it had to
18    be.  He needed somebody to act as a trustee because
19    Brookline was a trust and he couldn't be the trust on
20    his own trust -- or trustee on his own trust.  So the
21    conversation was that he needed a trustee to do trust
22    business and they would be in charge of everything.
23    Unfortunately, the trustee was in charge of nothing.
24    It was a complete front.
25         Q.    So you agreed to serve as trustee for

Patrick Shannon                                      July 25, 2017

Page 28

1    Brookline --

2              A.    Yeah.  There was myself --

3              Q.    -- Properties?

4              A.    -- and one other guy, Lance Ekhart.

5    I've seen that name associated with it, Ekhart,

6    Ekhart.

7              Q.    Did you --

8              A.    There's another company down out here

9    on the coast, I think is the person who wrote

10   Brookline Properties.  I don't know what the record

11   name is.  I can't remember.  I don't have enough

12   documentation to even go back and look for it, but

13   that guy was a trustee also or a trust writer.  I'm

14   not really sure what it was.  But David knew him,

15   knew of him.  He was like who he counseled with like

16   how this stuff needed to work.

17             Q.    When you became a trustee of Brookline

18   Properties, Lance Ekhart was also a trustee?

19             A.    I believe so, yeah.

20             Q.    And this other person on the coast was

21   also a trustee?

22             A.    I think he was.  I never seen the

23   papers with that guy's name on as a trustee, but

24   David talked about him and about Brookline a lot and

25   basically made this guy out to be some sort of legal

Patrick Shannon                                        July 25, 2017

1    professional who knew about trusts.  I can't remember

2    the name of that organization or that -- the guy's

3    office.  I can't remember.

4              Q.   Were there any other trustees?

5              A.   Not that I knew of.

6              Q.   Did you see any documents that had

7    established Brookline Properties when you became the

8    trust or at any point?

9              A.   No.  He brought me a piece of paper.

10   It's in the copies.  That's what I know of it.  I

11   signed a piece of paper and said I would be a trustee

12   and it's notarized.

13             Q.   Do you know when Brookline Properties

14   came into existence?

15             A.   No, at least not by my memory.

16             MR. BUTLER:  Could you please mark

17   that.

18             (Exhibit-1 marked.)

19             MR. BUTLER:  John, I don't have copies

20   of my documents for you but I can email them to you.

21             MR. COLVIN:  Okay.

22             Q.   Please take a look at what's been

23   marked as Exhibit-1.  Are you familiar with that

24   document?

25             A.   Yeah, I am.

Patrick Shannon                                          July 25, 2017

                                                              Page 30

1              Q.    In the middle there, is that your

2    signature?

3              A.    It is.

4              Q.    So what is this document?

5              A.    As far as I know, it's the document

6    that I agreed to be a trustee.

7              Q.    So this is what he gave you when he

8    asked you to be a trustee?

9              A.    Right.

10             Q.    Do you know why the word "properties"

11   is consistently misspelled throughout this document?

12             A.    Until just now, no.  That would be par

13   for the course.

14             Q.    Okay.  Yeah, I just see that --

15             A.    Spell check evidently didn't work.

16             Q.    -- in at least four places, it's

17   spelled P-R-O-P-E-T-I-E-S.

18             A.    Yes.

19             Q.    It's missing an R, but it's consistent.

20   But you think that's just, those are just typos?

21             A.    I would imagine.  So I don't know.  I

22   don't know if he would intentionally do that.  He may

23   have intentionally done that.  Till you just pointed

24   it out, I never read it.  I always read it as

25   Brookline Properties.

Patrick Shannon                                    July 25, 2017

1            Q.    What were your duties as trustee?

2            A.    My understanding from David, and at the

3    time I didn't know what a trustee was supposed to be

4    doing, so I even had to go do some reading up on it,

5    my job was to make sure that Jane and the children,

6    being presumably the beneficiaries, were protected in

7    that the assets of the trust weren't squandered.

8    That was the initial understanding.  What really came

9    about from that was it didn't matter whose piece of

10   paper you had and what name you had on it, nobody had

11   control of it but David.

12           Q.    So it was your understanding that Jane

13   Polinder and her children were beneficiaries?

14           A.    Were beneficiaries of this.

15           Q.    The Brookline Properties trust?

16           A.    Yes.

17           Q.    Did you ever see any paperwork

18   identifying them as beneficiaries?

19           A.    No, I took David's word for that.

20           Q.    Did you have authority to obtain loans

21   on behalf of Brookline Properties?

22           A.    Never on my own.  If there were any

23   loan papers signed, David is the one who would

24   arrange for it.  And the only thing he needed me for,

25   or maybe Lance because I didn't see it all, was to go

Patrick Shannon                                        July 25, 2017

Page 32

1    down there to sign on the dotted line, because it was

2    either a transfer or a bank loan and there were just

3    a few of those.  I mean, there's only a couple of

4    pieces of property there.

5                Q.    Did you ever earn any income from

6    Brookline Properties as the trustee?

7                A.    Wouldn't that be fun if I got paid, but

8    no.

9                Q.    Did you otherwise earn any money from

10   Brookline Properties?

11               A.    No.

12               Q.    Did Brookline Properties have any

13   employees?

14               A.    In reality, I think the only employee,

15   if there was such a thing, would be David, because

16   he's the one that effectively owned it and used it

17   like a tool.

18               Q.    Were properties titled in Brookline

19   Properties' name?

20               A.    I would have to look in that pile of

21   folders.  I haven't read that since way back in the

22   day, but I'm pretty sure some of the name of

23   Brookline Properties is there.

24                      (Exhibit-2 marked.)

25               Q.    Please take a look at what's been

Patrick Shannon                                      July 25, 2017

Page 33

 1    marked as Exhibit-2, documents that you produced

 2    today.

 3              A.    He spelled it right there.

 4              Q.    Are you familiar with these documents?

 5              A.    Other than they were in my possession?

 6    I think these are all a part of the Shauna short plat

 7    thing.  I don't know how to read the title movements

 8    there.  I don't see my name on any of it.

 9              Q.    If you look at the second page of

10    Exhibit-2.

11              A.    Yeah, my name is typed there, but my

12    name down here on the signature side isn't on it.

13              Q.    So this real estate excise tax

14    affidavit, have you seen this before?

15              A.    Like I say, other than it was in my

16    file folder of stuff, I haven't even paid attention

17    to it.

18              Q.    So can you look at the page in

19    Exhibit-2 that, it looks like there are two of them.

20    The first one that says Exhibit-A, do you know if

21    this is referring to the property at 6109 Evergreen

22    or 2450 Thornton Road?

23              MR. LUKOFF:  I think he's talking about

24    this --

25              THE WITNESS:  Oh, this one right here?

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

Patrick Shannon                                          July 25, 2017

                                                              Page 34

 1                   MR. LUKOFF:  This is Exhibit-A.

 2                   THE WITNESS:  Yeah, gotcha.

 3         A.    I don't, but I know how to get into the

 4    assessor's office online and look up that, and I

 5    could confirm or deny that.  I know how to find that.

 6    Specifically, no.

 7         Q.    Take a look at the last page of the

 8    exhibit, please.  Have you seen this quitclaim deed

 9    before?

10         A.    No.

11         Q.    In the middle there, this is Shauna

12    short plat, lots 1, 2, 3?

13         A.    Yeah, that's the one off of Thornton

14    Road there.  There's only one Shauna short plat.

15         Q.    Up at the top is the name Lance Ekhart.

16    Is that the person you were referring to before who

17    was the other trustee?

18         A.    Yes.

19         Q.    Do you know anything about him other

20    than he was a trustee?

21         A.    I've never even met Lance, and if I

22    did, I can't remember.  I've heard of Lance.  I've

23    seen Lance's name on stuff and David has talked about

24    Lance, but I don't even know what he looks like.

25         Q.    Do you know what his occupation was in

Patrick Shannon                                    July 25, 2017

Page 35

1    1998?

2              A.    Not even close.  I don't know what he

3    was doing.

4              Q.    Do you know what his occupation was at

5    any point?

6              A.    No, I do not.

7              Q.    In the middle there, it says, "The

8    grantor, David A.  Gould, for and in consideration of

9    capital unity of indeterminable value conveys and

10   quitclaims to Brookline Properties the following

11   described real estate."

12             A.    Uh-huh.

13             Q.    Do you know what "capital unity of

14   indeterminable value" means?

15             A.    No.  I'm pretty sure knowing the way

16   David thinks, the little that I know, he's being as

17   opaque as he can.  I don't think that's a company.

18             Q.    Do you know if Brookline Properties --

19   well, before I ask you that, let me direct you, down

20   at the bottom of this page you're looking at, the

21   last page of Exhibit-2, it says dated May 12, 1998,

22   correct?

23             A.    Yes.

24             Q.    If you look at Exhibit-1, toward the

25   bottom there, the last paragraph it says on May 12,

Patrick Shannon                                    July 25, 2017

Page 36

1    it looks like 1998, and up above that there's a date

2    of 5-12-98 next to your signature?

3            A.    Right.

4            Q.    So do you know why these two documents

5    have the same date?

6            A.    I don't have a clue.

7            Q.    When you became trustee of Brookline

8    Properties, were you aware of David Gould

9    transferring property to Brookline Properties?

10           A.    Not directly, he didn't.  I assumed

11   that's why I was there, that he had put property in a

12   trust and I was supposed to be the trustee.  But I

13   don't remember a conversation in '98 describing this

14   document.

15           Q.    Okay.

16           A.    Other than, you know, I have a trust

17   and I need a trustee and it's got property in it.

18           Q.    So you were just generally aware that

19   the trustee held some kind of property?

20           A.    Right, and I assume it was the Shauna

21   short plat stuff.  I don't know of any others.

22           Q.    Do you know if Brookline Properties

23   paid anything for the title for the Shauna short

24   plats?

25           A.    I don't even know how he got that

Patrick Shannon                                      July 25, 2017

Page 37

1    property.  I don't know how David originally acquired

2    it.  I don't know.

3            Q.    What would you say was David Gould's

4    role with Brookline Properties?

5            A.    The sole owner.

6            Q.    What did he do as the owner?

7            A.    Everything.  He did -- if there was

8    money involved, he did all the money.  I'm sure there

9    were bank accounts associated with it, probably at US

10   Bank.  Maybe more places, I don't know.  I say US

11   Bank because most of this that involved money

12   happened at the US Bank in Lynden.  And he had and a

13   particular loan officer there that he was good

14   friends with, so I assumed it was there.  But as far

15   as getting any access to that or any other accounts,

16   he wouldn't give up anything.

17           Q.    So he made all the -- he solely made

18   all the business decisions for Brookline?

19           A.    Yeah.  I mean, if he made any decisions

20   based on conversation with myself or Mr. Ekhart, I

21   have no idea if anything that we said he would have

22   done.  I'm pretty sure it wouldn't have been -- you

23   know, it was advice only.

24           Q.    So David Gould solely made all the

25   financial decisions for Brookline Properties

Patrick Shannon                                    July 25, 2017

Page 38

1    including obtaining loans?

2            A.    Oh, yeah.   He never ever once let us

3    have any kind of power.   Me, I don't know about

4    Lance, he never let us have any kind of power at all.

5    It was purely to sign a piece of paper.

6                 (Exhibit-3 marked.)

7            Q.    Please take a look at what's been

8    marked as Exhibit-3.

9            A.    Okay.

10           Q.    You see on the bottom it's a Bates

11   number, there's USA and then a number?

12           A.    Yeah.

13           Q.    Could you turn to USA03024.

14                 MR. LUKOFF:   May I interrupt for a

15   moment?   Can we review that document before you ask

16   some questions?

17                 MR. BUTLER:   Yeah, yeah.   I'll just ask

18   this and give him a chance to take a look at it.

19           Q.    Is that your signature?

20           A.    That looks like my signature, yes.

21           Q.    So go ahead and take a look at the

22   document.

23                 (Discussion off the record.)

24                 MR. LUKOFF:   Are these the documents

25   that you had given to --

Patrick Shannon                                    July 25, 2017

1                    THE WITNESS:  I don't know.

2                    MR. LUKOFF:  Okay.

3                    THE WITNESS:  This is a long time ago.

4                    MR. LUKOFF:  Okay, so you don't

5      recognize this document necessarily?

6                    THE WITNESS:  Not in this size, no.

7      Not in the other size.  I have to go look through the

8      file and see if they're there.

9                    MR. LUKOFF:  Okay.  May I take my

10     client out for a moment?

11                   MR. BUTLER:  Yes.

12                   MR. LUKOFF:  Thank you.

13                   (Brief recess.)

14                   MR. BUTLER:  Let's go off the record.

15                   (Discussion off the record.)

16                   MR. LUKOFF:  So I just asked --

17                   MR. BUTLER:  We'll go back on the

18     record, please.

19                   MR. LUKOFF:  So I just want to clarify,

20     I just asked my client about Exhibit-No.-3 and he

21     said something to me that caused me concern for a

22     moment.  I said have you seen this document before?

23     And he goes I would have to go through all those

24     papers.  So I took him outside and I said do you have

25     any more papers?  He goes no.  All the papers I have

Patrick Shannon                                          July 25, 2017

Page 40

1    are right here and I gave those to attorney Butler.

2                    THE WITNESS:  So I'm assuming that is

3    something you've got, out of a pile I brought you.

4                    MR. BUTLER:  That's correct, these are

5    Bates stamped with that USA.

6                    THE WITNESS:  I'm on board now, I

7    gotcha.

8                    MR. BUTLER:  And they may or may not be

9    in that pile, I don't know.

10                   THE WITNESS:  Yeah, they may or may not

11   be there.

12             Q.    So do you recognize these documents?

13             A.    My memory is not that good to recognize

14   a document I signed that far ago.

15             Q.    Okay.

16             A.    2004.

17             Q.    You do see your signature --

18             A.    Absolutely.

19             Q.    -- appears throughout in several pages?

20             A.    Yeah.

21             Q.    Can you turn to what's marked at the

22   bottom right as USA03026.

23             A.    Exhibit-A, legal description?

24             Q.    Yes.

25             A.    Okay.

Patrick Shannon                                      July 25, 2017

Page 41

1            Q.    If you take a look at Exhibit-2, back

2    to the first page that says Exhibit-A, would you say

3    those are describing the same property?

4            A.    It looks really close to exactly the

5    same thing.  It looks like the same thing, "section

6    18, township" (reading from document).  That looks

7    exactly the same.

8            Q.    Okay.  So if you turn to page 1 of

9    Exhibit-3, please, up at the top left, it says,

10   "Principal, $75,479.48"?

11           A.    Yes, sir.

12           Q.    "Loan date, 4-15-2004," and down below,

13   "Borrower:  Baycor Construction LLC, 2450 Thornton

14   Road, Ferndale, Washington?

15           A.    Yes.

16           Q.    Do you know what transaction that

17   refers to?

18           A.    I have supposition and supposition

19   only.  To sell this property or to improve the

20   property of the Shauna short plat, the city required

21   him to put in curbs, gutters, sidewalks, sewer

22   connections, water connections, that whole thing,

23   even light poles, and I'm almost positive that this

24   was his way of financing to get that done.

25           Q.    Do you know why -- turn to page in

Patrick Shannon                                    July 25, 2017

Page 42

1    Exhibit-3, USA03033.  So toward the top there under

2    borrower, Baycor Construction, it says, "Grantor:

3    Patrick Shannon, trustee of Brookline Properties."

4              Down at the bottom left, is that your

5    signature?

6         A.    That is.

7         Q.    Do you know why you had to sign this?

8         A.    No.  Agreement to provide insurance?  I

9    don't know.

10        Q.    Do you recall Mr. Gould saying anything

11   about Brookline Properties' involvement with a

12   $75,000 loan?

13        A.    Like I said, the only thing that I

14   think -- I'm speculating.  The only thing I can think

15   that what he would use it for would be that, because

16   there was conversation about how the city was

17   requiring him to do all the street improvements

18   before he could finish the short plat.  So that's,

19   I'm speculating, what it was.  I don't know what

20   those improvements cost.

21        Q.    It appears to be listing the borrower

22   as Baycor Construction.  Do you know why Brookline

23   Properties would be involved?

24        A.    I can only speculate.  The only way he

25   could get the loan -- this is Peoples Bank.  The only

Patrick Shannon                                    July 25, 2017

1    way he could get the loan would be he had to put

2    something up on the loan.  The only way he could put

3    some asset up there was if he had Brookline, which

4    technically was supposed to own the property, get a

5    loan and give it to Baycor.

6            Q.    Okay.  Do you know what Baycor

7    Construction LLC was?

8            A.    As far as I know, it was exactly what

9    it says.  It was his construction company.  It was

10   the company he was using to do all of his

11   improvements through.  So he was using Baycor as, you

12   know, the company that he would interface with

13   suppliers and labor and everybody else to be a

14   construction company.  Those documents, I have no

15   idea where they're at.

16           Specifically I'm assuming it was.  He

17   had a blue Ford truck that said Baycor on the side of

18   it with a ladder rack on top.  He acted like it was a

19   construction company.  I assumed it was.

20           Q.    Do you know if Baycor had any

21   employees?

22           A.    David, unless he hired day labor.

23           Q.    Were you involved with Baycor

24   Construction at all?

25           A.    Other than, you know, like here on

Patrick Shannon                                                July 25, 2017

Page 44

```
 1   paper, I never was labor for him.  I never worked in
 2   Baycor Construction.  I don't -- I mean, it was -- as
 3   far as I know, it was a one-man show.  He used it as
 4   his interface with suppliers and the county and
 5   everybody else that did -- you know, issued permits
 6   and things like that.
 7              Q.   Do you know if Jane Polinder was
 8   involved with Baycor Construction at all?
 9              A.   I have no idea.  I don't know if she
10   was on anything.  I wouldn't put it past David to
11   have her sign stuff, but I don't -- I mean, as a
12   day-to-day thing, that was her husband's thing.
13              Q.   Do you know if Mr. Gould did have
14   Ms. Polinder sign things?
15              A.   In these records that you looked at,
16   there's a couple of things in there.  One of them is
17   a promissory note for like -- I don't know.  There's
18   a couple of hundred dollars there on a promissory
19   note that has her signature on it.  I'm pretty sure
20   that that was probably a common occurrence, but it
21   was nothing that I was ever party to.  Like it wasn't
22   something I ever seen.
23              Q.   You say it was a common occurrence that
24   he would --
25              A.   I'm pretty sure he would require her to
```

Patrick Shannon                                    July 25, 2017

Page 45

1    do, you know, because, you know, she was his wife.

2    If he needed her signature for something, he'd just

3    tell her to sign it, and she would sign it.

4              Q.   But you never witnessed that happening?

5              A.   No, I did not.  That would be purely

6    hearsay on my part to say I've seen that.

7              Q.   In this case with Exhibit-3, beyond, do

8    you know if Mr. Gould asked you to sign these

9    documents?

10             A.   I'm sure he did.  It's been long enough

11   ago that I can't even remember doing it.  But I'm

12   pretty sure he asked me to sign them and I'm pretty

13   sure I probably did.  I mean, that's looks like my

14   signature.

15             Q.   Would you have investigated anything

16   behind these documents, what the purpose or --

17             A.   I'm sure there was a conversation.  Why

18   do we need to get a loan on the property?  And I'm

19   pretty sure like I said that this was -- the goal of

20   this was to do the improvements so he could finish

21   out the short plat.

22                  I know there was a conversation like

23   that that the city had come down and said well, you

24   can't do any of this until this is done.  It held up

25   his entire project.  So he had to get money from

Patrick Shannon                                   July 25, 2017

Page 46

1    someplace, and I'm sure that this is how he did it.

2    I don't know that he had lots or little other money.

3    I don't know.  I wasn't -- I didn't ever get a bank

4    statement on anything.

5                    MR. BUTLER:  Please mark that.

6                    (Exhibit-4 marked.)

7              Q.    Please take a look at what's been

8    marked as Exhibit-4.

9                    MR. LUKOFF:  Do you remember this being

10   notarized?

11                   THE WITNESS:  No, I don't remember.

12   That's too long ago.  I have a hard time remembering

13   last month.

14                   MR. LUKOFF:  Talk to me before you ever

15   sign anything again.

16                   THE WITNESS:  Yeah.  Life has changed

17   much since here.

18                   MR. LUKOFF:  Do you know what that is?

19                   THE WITNESS:  Yeah, that's me.

20                   MR. LUKOFF:  Okay.

21                   THE WITNESS:  What that is, I'd have to

22   go through and read it.  I have no idea.  That's just

23   another one of the lots.

24                   THE REPORTER:  I'm having a problem.

25   You're saying for me to write it when I can hear it.

Patrick Shannon                                    July 25, 2017

                                                        Page 47

1    And sometimes I can hear and sometimes I can't, and

2    I'm writing it down and you're getting a really weird

3    record.

4                    THE WITNESS:  Oh, I'm sorry, I can stop

5    talking.

6                    THE REPORTER:  No, I don't care.

7                    But you instructed me to write down

8    what I hear.

9                    MR. BUTLER:  We're still on the record,

10   so I guess --

11                   MR. COLVIN:  Why don't we go off the

12   record when you're reviewing the document.

13                   MR. BUTLER:  I'll say when they're

14   reviewing, we can go off the record.

15                   (Discussion off the record.)

16                   MR. BUTLER:  Let's go back on the

17   record, please.

18          Q.   Do you recognize the documents that

19   you've been provided as Exhibit-4?

20          A.   I recognize my signature, but I don't

21   recognize specifically the document.

22          Q.   Okay.  On the page that is USA03074.

23          A.   Yes, sir.

24          Q.   Is that your signature there at the

25   bottom?

Patrick Shannon                                      July 25, 2017

Page 48

1          A.    It is.

2          Q.    Do you see below it says, "Patrick

3    Shannon, general trust manager of Brookline

4    Properties"?

5          A.    Right.

6          Q.    So that was your title with Brookline?

7          A.    Yeah, whatever this thing says here,

8    general trust manager Brookline Properties.

9          Q.    Do you know what this, what transaction

10   these documents relate to?

11         A.    No, I do not.

12         Q.    If you look at the second page of

13   Exhibit-4, at the bottom left toward the middle, it

14   says, "David Gould, Director of Director of

15   Excalibur"?

16         A.    Right.

17         Q.    Do you know what Director of Excalibur

18   was?

19         A.    I think, I'm pretty sure it's similar,

20   I'm positive it's like this (indicating).

21         Q.    Which is, you're holding up the

22   articles of incorporation for Director --

23         A.    Director of Deerbrook.  I think

24   Director of Excalibur is David's version, because my

25   mom bought this from David, a private religious

Patrick Shannon                                    July 25, 2017

Page 49

1    corporation sole, I'm positive that's what it is.

2              Q.   Okay.

3              A.   Only because it's "director of" and

4    that's, you know, that's similar to this one.

5              Q.   And are you aware of Director of

6    Excalibur being a member of Baycor Construction LLC?

7              A.   Not even close, no.

8              Q.   Do you know what Director of

9    Excalibur's function was?

10             A.   With David, I would have to assume it

11   was a tool that he could use in his belief that would

12   avoid him having to report or pay taxes on anything

13   that he made out of this deal, another way to hide

14   something.

15             Q.   So if you look at Exhibit-4, the page

16   marked at the bottom right USA03068.

17             A.   Okay.

18             Q.   At the top -- well, go to the previous

19   page, the one marked 03067.

20             A.   Okay.

21             Q.   And it says at the bottom, or at the

22   middle, "This deed of trust is dated January 20,

23   2005."

24             A.   Right.

25             Q.   "Among Patrick Shannon, not personally

Patrick Shannon                                          July 25, 2017

Page 50

1    but as trustee on behalf of Brookline Properties."

2             Then the next page, it has a

3    description there, parcel A?

4        A.    Right.

5        Q.    And below that, "The real property or

6    its address is commonly known as 2450 Thornton

7    Street, Ferndale, Washington"?

8        A.    Okay.

9        Q.    So do you recall a transaction related

10   to 2450 Thornton Street, January 20, 2005?

11       A.    No.  In and of itself, I would have to

12   assume this is all about trying to build out the

13   Shauna short plat.  This specific thing, I don't have

14   a memory that goes back that far.  My signature and

15   initials are on here, but specifically what the

16   conversation was about this, I don't know.

17       Q.    Can you turn to in Exhibit-4 the page

18   marked USA03085.

19       A.    Okay.

20       Q.    At the top it looks like what was

21   written, Notice of Final Agreement, correct?

22       A.    Yes.

23       Q.    Down at the bottom left, is that your

24   signature?

25       A.    That is.

Patrick Shannon                                    July 25, 2017

Page 51

1            Q.   If you turn to the next page, it says,
2    "Guarantor," and then, "Gerald Polinder,
3    individually"?
4            A.   Yes, sir.
5            Q.   Do you recall him being present and
6    signing this document when you did?
7            A.   I don't remember that, no.
8            Q.   Do you recall being aware of Gerald
9    Polinder being involved with this transaction?
10           A.   In conversation I remember Jane telling
11   me that her parents had got involved with David,
12   loaning money or loaning money to him or getting
13   money to him.  But specifically this one, no.  I
14   mean, it was a conversation and then later on that
15   conversation changed to she had warned her parents to
16   not deal with him anymore.
17           Q.   When was it that she said she had
18   warned her parents not to deal with him anymore?
19           A.   I'm speculating only, but I would have
20   to guess it was probably shortly after this, after
21   they lost their money, if this is what this was.
22   Because I'm pretty sure they came up losing money out
23   of this deal.
24           Q.   Okay.  Do you know if Jane Polinder had
25   any role with Brookline Properties?

Patrick Shannon                                    July 25, 2017

Page 52

1          A.    Honestly, other than to be told to sign

2    something when she was supposed to sign something,

3    no.

4          Q.    You can put that aside.

5          A.    Okay.

6          Q.    Who made the decisions regarding the

7    property at 6109 Evergreen or 2450 Thornton Road?

8          A.    By this paper, it was supposed to be

9    me, but I never made any decisions on anything

10   because it all had to go through David and David's

11   the one that called the final ball.

12         Q.    Do you know following the transfer of

13   the property, the same property at 6109 Evergreen in

14   1998, do you know who resided there?

15         A.    David did.

16         Q.    With?

17         A.    With Jane.

18         Q.    And their children?

19         A.    Yes.

20         Q.    That was until they went to Costa Rica?

21         A.    I believe so, yeah, and then they came

22   back and I believe they moved back in there.

23         Q.    Do you know who paid the mortgage on

24   that property?

25         A.    I assume that David did.  I didn't know

Patrick Shannon                                    July 25, 2017

Page 53

 1    there was a mortgage.

 2              Q.    Do you know if anyone paid rent after

 3    1998 to Brookline Properties for that property?

 4              A.    When they were in Costa Rica, there

 5    were -- when they left for Costa Rica, there was a

 6    family living there and David asked me to act like

 7    the landlord.  And in that, my goal was to make sure

 8    that the tenants were taken care of, but they paid

 9    rent into an account.  I don't know where that

10    account was.

11              Q.    The tenants did?

12              A.    The tenants did, yeah.  They paid rent

13    into an account.  They gave money to somebody.  I had

14    to pay rent, and those tenants were there for a short

15    period of time initially.  After they left, probably

16    less than six months, and then they kind of left the

17    place in a mess and David wanted me to clean it all

18    up for him and get another tenant in there.

19              So I got another tenant in there.  I

20    can't remember their name right now, but my wife will

21    know who they were, because he used to work for the

22    border patrol, the guy that rented the place.  They

23    were there for about six, maybe eight months before

24    they moved out and bought a piece of property.

25              And the same arrangement was true.  I

Patrick Shannon                                      July 25, 2017

Page 54

1    don't know where they paid the rent to, put it in an
2    account, they had a rent check and it sent someplace.
3    I don't know where it was.
4              Q.   Do you know if after 1998, either David
5    Gould or Jane Polinder paid rent to Brookline
6    Properties for use of the property at 2450 Thornton
7    Road?
8              A.   I do not know.
9              Q.   And apart from when there were renters
10   there and you helped with the house, when David Gould
11   and Jane Polinder were living there, who took care of
12   upkeep on that house?
13             A.   When there were renters there?
14             Q.   No, when there were not renters.
15             A.   David.
16             Q.   He did?
17             A.   Yeah.
18             Q.   Was there a lawn?
19             A.   Was there a lawn?
20             Q.   Yeah.
21             A.   There was quite the lawn to the south
22   of the house on the Thornton Road side.  There was
23   quite a big lawn there.
24             Q.   Did David Gould take care of that?
25             A.   I assume so, yeah.  He took care of --

Patrick Shannon                                    July 25, 2017

Page 55

1    there was those two lots out front and I think there

2    were three behind it to the north and all in a row.

3    That was kind of overgrown and quite a mess until he

4    sold it off.

5                Q.    So after 1998 when David Gould and Jane

6    Polinder were occupying that same house, do you know

7    who paid the utility bills for that property?

8                A.    I would have to assume David did.  I

9    don't know.  David or one of his companies.

10               Q.    Did you know who paid the property tax?

11               A.    In the end, it was David.  There's a

12   bunch of property tax records there that he almost

13   lost the house to a tax sale because he refused to

14   pay the property taxes, but he eventually caught up

15   on that.

16               Q.    Did you ever pay the property tax using

17   a money order?

18               A.    That could possibly be.  It would be a

19   money order that David would have given me.

20               Q.    Would you have sent the money from

21   Camas, Washington?

22               A.    No.  That is that other guy earlier I

23   talked about.

24               Q.    But you don't recall ever sending a

25   money order from Camas?

Patrick Shannon                                      July 25, 2017

Page 56

1          A.    No, I did not send one from Camas.

2          Q.    And you mentioned that they might have

3     had, David Gould and Jane Polinder might have had

4     another rental property in the early 2000s?

5          A.    They had another house in Bellingham on

6     the east side of the freeway.  It seems like it was

7     off of Lakeway Drive back there.  I don't know the

8     address of it.  There was another home.  That's where

9     I initially met them.  That was their initial primary

10    home, and while they were in Costa Rica, there was a

11    renter in that home too.

12         Q.    Do you know if there were --

13         A.    Gerard Street?  Gerard Street address

14    of some kind.

15         Q.    Do you know if there was a renter in

16    that home when they were not in Costa Rica?

17         A.    I have no idea.

18         Q.    How do you know there was a renter in

19    that home when they were in Costa Rica?

20         A.    Because that lady called me one night

21    when the hot water stopped working, and I had to go

22    try to light her pilot light in the underneath and

23    the crawl space, and I started the crawl space on

24    fire and then she moved out shortly thereafter.  She

25    was not happy.  It was funny.

Patrick Shannon                                July 25, 2017

Page 57

1                    (Exhibit-5 marked.)

2            Q.    Please take a look at what's been

3    marked as Exhibit-5, JP00014 and 15.  Do you

4    recognize this document?

5            A.    Not directly.  I recognize my signature

6    as the trustee.

7            Q.    So that is your signature in the middle

8    of the page?

9            A.    It is.

10           Q.    Do you know who Jack Wells is?

11           A.    I would speculate that Jack Wells and

12   Charlotte are probably one of the people that bought

13   a lot to build a house on.

14           Q.    One of the lots on the property?

15           A.    Shauna.

16           Q.    6109 Evergreen?

17           A.    Yeah, that's speculation on my part.  I

18   could go do research and find out, but I'm not sure.

19           Q.    You don't recall this transaction

20   specifically?

21           A.    No.

22                 (Exhibit-6 marked.)

23           Q.    Exhibit-6 is JP00016 and 17.  Let's

24   take a look at what's been marked as Exhibit-6.  Do

25   you recognize this document?

Patrick Shannon                                      July 25, 2017

Page 58

1          A.    Other than my signature as the trustee,

2     no, it's been too long ago for me to remember that,

3     2003.

4          Q.    Again, you don't remember, specifically

5     remember what transaction this might be?

6          A.    I do not.

7          Q.    You don't -- do you know if you ever

8     met Jack Wells?

9          A.    I don't think so.  I met a lot of

10    people who live in Ferndale.  I've been there a long

11    time, but specifically Jack, Mr. Wells, I don't know.

12         Q.    How would your signature have appeared

13    here?  Would David Gould have handed you this

14    document and asked you to sign it?

15         A.    Quite possibly, yeah, I'd almost --

16    yeah.

17         Q.    Is there any other way where your

18    signature would have gotten on there?

19         A.    The way this primarily worked is he'd

20    have me meet him someplace.  This was Chicago Title,

21    so it was probably meet me at Chicago Title, I have

22    paperwork I need to get signed.  And I'd go down

23    there and I'd sign paperwork.

24         Q.    Would you ever question --

25         A.    Oh, yeah, it started growing all the

Patrick Shannon                                    July 25, 2017

Page 59

1    time.  It's, you know, I never had control.  The some
2    control I had, it was the pen on the piece of paper,
3    and it was become obvious to me that he had no intent
4    of relinquishing any kind of control.  He was using
5    me as a patsy.
6                   (Exhibit-7 marked.)
7              Q.    Exhibit-7 is JP00012 and 13.  Do you
8    recognize this document?
9              A.    Again, no, I do not.
10             Q.    But that is your signature on the first
11   page?
12             A.    That is my signature on the front page,
13   yes.
14             Q.    And you don't recall in March of 2003
15   this transaction with these three lots?
16             A.    Honestly, no, I do not.
17                  (Exhibit-8 marked.)
18             Q.    Exhibit-8 is JP00009 through 11.
19   Please take a look at what's been marked as
20   Exhibit-8.
21             A.    Okay.
22             Q.    Have you seen these documents before?
23             A.    Not to my memory, no.
24             Q.    Do you know why on the first page under
25   declarants, there would be your name?

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com    206.622.6661 * 800.657.1110  FAX: 206.622.6236

Patrick Shannon                                      July 25, 2017

1          A.   Oh, that's not my writing.  My printing

2     is far worse than that.

3          Q.   Do you know why your name would appear

4     there, though?

5          A.   I can only speculate.  Would you like

6     me to speculate?

7          Q.   Yes.

8          A.   I would only speculate on this date,

9     David couldn't get ahold of me, so he put my name on

10    it.

11         Q.   But you don't recall seeing these short

12    plat documents?

13         A.   In the stack is my signature.

14         Q.   Where is your signature?

15         A.   On page 2 under declaration, it's

16    faint, but that looks like my signature because the

17    TTE looks like my TTE.  So on that page, that's my

18    signature.  What would this have been for, and why is

19    it called the Baycor short plat?  It should be the

20    Shauna short plat.

21         Q.   Does this pertain to the same property

22    as the Shauna short plat?

23         A.   It does, because if you look on page 3,

24    the Shauna short plat has one, two, three lots and

25    now they're calling Baycor short plat 1, 2, 3 as the

Patrick Shannon                                July 25, 2017

Page 61

1    two front lots, the two fronting Thornton Road and

2    the one where his house is at, which is lot number 1.

3    I don't remember Baycor short plat.  It doesn't mean

4    anything, but I don't remember that.

5              Q.   So lot number 1, is that 6109

6    Evergreen?

7              A.   Right, that's the original farmstead

8    house.  That's where David lived.

9              Q.   And on the last page of Exhibit-8, lots

10   2 and 3 --

11             A.   Those used to be the front yard and

12   then now there's two houses live there.

13             Q.   So you see above lot 1, it says Shauna

14   short plat?

15             A.   Correct.

16             Q.   3?

17             A.   Yes.

18             Q.   Do you know if he had made something,

19   the other parts Baycor and --

20             A.   By looking at this, that looks to be

21   what it is.  Baycor Construction is his construction

22   company.  I don't remember how this would have got

23   over to Baycor.

24             Q.   Okay.

25             A.   Because it was my understanding Shauna

Patrick Shannon                                    July 25, 2017

Page 62

1    short plat was the whole six lots counting the house.

2    I don't know.

3                    (Exhibit-9 marked.)

4            Q.   Please take a look at what's been

5    marked as Exhibit-9.

6            A.   Yeah, I don't remember the conversation

7    that changed that.  I have no idea.  You pointed.  I

8    was trying to answer a question here.

9                    MR. BUTLER:  Off the record.

10                   (Discussion off the record.)

11                   MR. BUTLER:  Back on the record.

12           Q.   So is that your signature on the first

13   page of Exhibit-9?

14           A.   It is.

15           Q.   Do you recall, have you seen these

16   documents before?

17           A.   Before my signature being there, I am

18   sure I have seen them before, all of these, but I

19   don't remember these specifically, no.

20           Q.   Do you know what Goldstar Enterprises

21   is?

22           A.   No.  Where is that at?

23           Q.   If you look at the first page of

24   Exhibit-9 under where it says Statutory Warranty

25   Deed, it says, "The grantor, Patrick Shannon, trustee

Patrick Shannon                                    July 25, 2017

Page 63

1    of the Brookline Properties, a common law

2    unincorporated business organization, for and in

3    consideration of $10 and other valuable consideration

4    in hand paid, conveys and warrants to Goldstar

5    Enterprises Incorporated."

6              A.   I have no idea what that is.  I have

7    never heard him even talk about that.  Not

8    surprising.

9              Q.   In March of 2006, you don't recall

10   signing this deed specifically?

11             A.   No.  I guess the person who should have

12   known, I should keep records of that, but I didn't

13   keep any records on that.

14                  (Exhibit-10 marked.)

15             Q.   Exhibit-10 is JP00066 and 67.  Take a

16   look at what's been marked as Exhibit-10.

17                  MR. LUKOFF:  Can you give us a moment

18   to review it?

19                  MR. BUTLER:  Sure, we can go off the

20   record.

21                  (Discussion off the record.)

22                  MR. LUKOFF:  Let's go back on the

23   record.

24             Q.   Do you recognize this document?

25             A.   I do not.  It's on the first page,

Patrick Shannon                                    July 25, 2017

Page 64

1    page 1, all that is my handwriting.  I can speculate

2    because that first page is the format at the Whatcom

3    County recorder's office that you have to fill out to

4    file a document.  So I would speculate that I was

5    given page 2 by David and asked to go down and file

6    it, and he would have had all the information for me

7    for page 1 written on some note someplace that I

8    don't have access to or know where it's at.

9                   And this is purely -- this is going

10   down and filing a document.  That's what it is.  My

11   name isn't -- or my signature is not on page 2, but

12   I'm the one obviously who filed this with the county.

13        Q.   At the top right of the first page is a

14   date there, May 1, 2009.

15        A.   Right.

16        Q.   So was that the date that you think you

17   might have filed this?

18        A.   Well, that's exactly the date it would

19   have been filed.  That's the county seat's stamp.

20        Q.   So you were still the trustee of

21   Brookline Properties in 2009?

22        A.   I don't know that for certain, no.  I'm

23   thinking that what this is, I don't remember the

24   exact date and time I told him to stuff it and run,

25   but this is something I may have run down and filed

Patrick Shannon                                    July 25, 2017

Page 65

1    for him.  I don't think I was the trustee of anything

2    here.  I don't know.  I can't remember.

3             Q.    Do you know what Financial Concepts

4    Limited is?

5             A.    Colton, Washington?  I do not

6    specifically know who Financial Concepts Limited is.

7    Where is Colton?  I don't know where Colton is.  The

8    other guy is in Camas.

9             Q.    Can you look on the second page of

10   Exhibit-10, please?

11            A.    Yes, sir.

12            Q.    And down toward the bottom it says,

13   "Affiant:  P.  Kelly, authorized representative,

14   Financial Concepts Limited"?

15            A.    I do not know who Mr. Kelly is.

16            Q.    Is that your handwriting there?

17            A.    No, sir.

18            Q.    Do you know if that's David Gould's

19   handwriting?

20            A.    I don't know that either.  I don't know

21   what that is.  That's not mine.

22            Q.    You don't know who Pete Kelly is?

23            A.    I don't know who Pete Kelly is and I

24   don't have any recollection of who Financial Concepts

25   is.

Patrick Shannon                                    July 25, 2017

Page 66

1                     MR. BUTLER:  Okay.

2                     (Exhibit-11 marked.)

3                     MR. BUTLER:  Exhibit-11 is JP00068 and

4    69.  We can go off the record while they review it.

5                     (Discussion off the record.)

6                     MR. LUKOFF:  I think we're ready to go

7    back on the record.

8          Q.    Do you recognize Exhibit-11?

9          A.    It is a document that I filed the same

10   day obviously because they're dated the same as

11   Exhibit-10.

12         Q.    That's your handwriting on the first

13   page?

14         A.    On page 1, yes.

15         Q.    On the second page there in the middle,

16   it says, "Debtor:  Brookline Properties," and then

17   under that, "By:  A. Michaels, authorized

18   representative for Brookline Properties."

19         A.    Yeah.

20         Q.    "Debtor's signature."

21         A.    That's not -- that is A. Michael's

22   signature.

23         Q.    Do you know who A. Michaels is?

24         A.    I do not.  This looks --

25                     MR. LUKOFF:  Let him finish his

Patrick Shannon                                    July 25, 2017

Page 67

1    question.

2                    THE WITNESS:  Oh, I'm sorry.

3           Q.    You do not know who A. Michaels is?

4           A.    I do not.

5           Q.    So whose signature is that?

6           A.    I'm assume that's A. Michaels'

7    signature.

8           Q.    And what were you going to say?

9           A.    This looks like the -- I'm speculating,

10   but this looks like the paperwork that got filed

11   sometime after I told David I could no longer help

12   him out, I could no longer do anything for him.  I

13   betcha that's the new trustee of Brookline

14   Properties.

15          Q.    But after you told him you couldn't do

16   anything for him, you were still filing paperwork for

17   him?

18          A.    I'm pretty sure it was in an attempt to

19   get as far away as I could.  I betcha that's who that

20   guy is.

21          Q.    I didn't understand your previous

22   answer, though.

23                So you filed paperwork for him so you

24   could get as far away from him as you could?

25          A.    Well, it looks like these, and I don't

Patrick Shannon                                    July 25, 2017

Page 68

1    even know what these are, so we've got a --

2            Q.    Exhibits-10 and 11?

3            A.    Right, Exhibits-10 and 11.  Going down

4    and filing paperwork at the county, lots of people do

5    that, and I'm -- I don't remember when the argument

6    between my wife and I occurred, but there was quite a

7    row about me no longer doing anything for him.  And

8    this was probably right close to one of the last

9    things I did for him.  Get somebody else on it and me

10   away from it.

11           Q.    On the second page of Exhibit-11, could

12   you turn to that, please.

13           A.    Yup.

14           Q.    At the top left there, it says,

15   "Debtor:  Brookline Properties 3510 NE Third Avenue,

16   number 100-233A, Camas, Washington, 98607."

17                 Are you familiar with that address?

18           A.    Not the address specifically, but I am

19   familiar with Camas, Washington, because that was my

20   understanding early on, was the person who created

21   the document that we're talking about, Brookline

22   Properties.

23           Q.    That's where that person --

24           A.    In Camas.  So I'm betting this is that

25   address.  This is where he went next, back to the

Patrick Shannon                                           July 25, 2017

Page 69

1    original creator.

2              Q.    By "he," you mean David Gould?

3              A.    David Gould, yeah.

4              Q.    Again, you don't know anything about

5    Financial Concepts Limited?

6              A.    No, I don't.  I'm sorry.

7              Q.    So you don't know if Financial Concepts

8    Limited actually paid Brookline Properties any money

9    for any part of the property at 6109 Evergreen Way?

10             A.    No.  I would venture this, if you would

11   like me to speculate.

12             Q.    Sure.

13             A.    I would venture that what David's

14   attempt here, and I don't know if the documents

15   support it, but he was a proponent of if he had a

16   piece of property or if he had control of property

17   and he wanted to make sure that it was tied up so

18   nobody else could lien it, he would find somebody

19   else to lien it for the value, and he would work some

20   sort of an agreement with them to lien that so that

21   there would be a first lien position holder on the

22   property that couldn't be moved.

23             Q.    And how --

24             A.    I betcha -- I'm speculating that that's

25   possibly what that is.  I don't believe -- I don't

Patrick Shannon                                    July 25, 2017

1    know if there was money that went back and forth,

2    but, you know, David was not the kind of person that

3    gave money for sure.

4              Q.   Okay.

5                   MR. LUKOFF:  May I interject for just a

6    moment?

7                   MR. BUTLER:  Yes.

8                   MR. LUKOFF:  How do you know what you

9    just said?

10                  THE WITNESS:  I heard him talking about

11   it.  That's what I know.

12                  MR. LUKOFF:  Okay.

13                  THE WITNESS:  As --

14                  MR. LUKOFF:  That wasn't clear.  I just

15   wanted you to say that for the record.

16             Q.   Did he talk to you about that?

17             A.   Oh, yeah.  He tried to talk to me about

18   all kinds of things.  That would be one of his ways

19   of trying to tie up property.  If there was no value

20   left for somebody, you know, they had a lawsuit

21   against him or something, there was no value and it

22   was all liened value and there was no value there,

23   then they wouldn't go after the property.  I don't

24   know how exactly you would make that work, but that

25   would be something David would -- has talked about

Patrick Shannon                                            July 25, 2017

Page 71

1    and would attempt.

2              Q.   Other than the documents you've seen

3    here today in the exhibits that we've gone over, did

4    you ever sign or execute any other document on

5    Brookline Properties' behalf?

6              A.   Not to my knowledge.  I mean, these

7    ones I can't even remember doing, it's been so long

8    ago.

9              Q.   Apart from documents on Brookline

10   Properties' behalf, did you ever sign any documents

11   on behalf of David Gould?

12             A.   In his own person?

13             Q.   Yes.

14             A.   Not to my knowledge, no.

15             Q.   And on behalf of Jane Polinder?

16             A.   Even less of a possibility there.  I

17   don't believe I did anything for them personally.

18             Q.   Are there records related to Brookline

19   Properties that exist that you do not have that David

20   Gould maintains?

21             A.   When David Gould fled the country, he

22   came by my house and he had a bunch of bankers boxes

23   that he dropped in my barn because he wanted to store

24   stuff.  I didn't know he was leaving the country, and

25   I thought because he was moving stuff in and out of

Patrick Shannon                                    July 25, 2017

Page 72

1    his house and away from his wife and kids or they

2    were moving, that he needed to place to store stuff.

3    So he left two or three bankers boxes at my house.

4    Then he fled and then he was gone.

5              Those bankers boxes, minus what you see

6    that I brought you, I've given to Jane since the

7    first of the year.  And at the end of last year she

8    came to me looking for any paperwork that David may

9    have left behind.  So if there is anything, there's

10   bankers boxes full of I-don't-know-what, because I

11   never looked in them, that she has possession of.  I

12   don't know what they are in there.

13             Q.   Do you know if Brookline Properties

14   still exists?

15             A.   Not to my knowledge.

16             Q.   Do you know when it stopped being

17   active?

18             A.   I don't know.  It would be sometime

19   past the date of Exhibit-10 or 11.

20             Q.   Sometime past 2009?

21             A.   Yeah.  I would speculate, yeah.

22             Q.   You saw before something referring to

23   Director of Excalibur?

24             A.   Right.

25             Q.   Do you know if that is different than

Patrick Shannon                                              July 25, 2017

Page 73

1   Excalibur Industries?

2           A.   No, not specifically.  Director of

3   Excalibur is like I showed you on this document, it's

4   a private religious corporation sole, whatever the

5   hell that is.  Excalibur Industries, I don't know

6   what that is.  I'm sure he probably used the same

7   name and recycled it into something else.

8           Q.   Do you know who Louise Johnson is?

9           A.   No.

10          Q.   Are you familiar with a lawsuit and

11  judgment against you as agent for Excalibur

12  Industries in 2002?

13          A.   Louise Johnson?  She was the renter who

14  I lit the crawl space on fire and smoked her out.

15          Q.   Were you aware that she sued you?

16          A.   No.  I never went to court or anything

17  like that, to my recollection.

18          MR. LUKOFF:  Were you ever served?

19          Q.   Please take a look at what's been

20  marked as Exhibit-12.

21          (Exhibit-12 marked.)

22          MR. LUKOFF:  Can we go off the record

23  for a moment?

24          MR. BUTLER:  Yeah.

25          (Discussion off the record.)

Patrick Shannon                                    July 25, 2017

Page 74

1            MR. BUTLER:  Back on the record.

2       Q.   Have you ever seen the documents that

3   comprise Exhibit-12?

4       A.   Not to my knowledge, no.  I do remember

5   this being the tenant, but these specific documents,

6   no.

7       Q.   Louise Johnson was a tenant where?

8       A.   I believe she lived in the house on

9   Gerard Street.  She was the other tenant in

10  Bellingham or the tenant in Bellingham.  There was

11  one in Ferndale.

12      Q.   She was the one where you had to

13  assist?

14      A.   Yes.

15      Q.   On the second page of Exhibit-12, up on

16  the top right there next to DEF 02 is Excalibur

17  Industries, and below that Patrick Shannon, agent,

18  5353 Olson Road, Ferndale, Washington.  Is that your

19  address?

20      A.   That is my address.

21      Q.   Are you familiar with Excalibur

22  Industries at all?

23      A.   No, that's obviously one of David's

24  things.

25      Q.   At that address there's no Excalibur

Patrick Shannon                                    July 25, 2017

                                                         Page 75

1    Industries?

2              A.    Oh, God, no.

3                    (Exhibit-13 marked.)

4                    MR. LUKOFF:  May we go off the record.

5                    MR. BUTLER:  Yes.

6                    (Brief recess.)

7                    MR. BUTLER:  Go back on the record,

8    please.

9              Q.    Are you familiar with Exhibit-13?

10             A.    I am.

11             Q.    What is it?

12             A.    Well, it says that it's a private

13   religious corporation sole.

14             Q.    These are the articles of incorporation

15   for Director of Deerbrook?

16             A.    Right.

17             Q.    Which is a private religious

18   corporation sole.  Let's take a look at the second to

19   the last page.

20             A.    Okay.

21             Q.    Is that your signature there toward the

22   top under where it says, "Patrick Shannon,

23   secretary"?

24             A.    Yeah, that is me.

25             Q.    And on the last page --

Patrick Shannon                                    July 25, 2017

```
                                              Page 76
 1                 MR. LUKOFF:  May I interrupt and go off
 2     the record for a moment?
 3                 MR. BUTLER:  Well, let me just finish
 4     this question.
 5           Q.    Is that your signature on the last page
 6     of the document in two places at the top and in the
 7     middle?
 8           A.    In two places, yeah.
 9                 MR. BUTLER:  Let's go off the record.
10                 (Discussion off the record.)
11                 MR. BUTLER:  Let's go back on the
12     record.  Could you please read back the last question
13     and response.
14                 (Record read as requested.)
15                 MR. BUTLER:  Thank you.
16           Q.    What was the purpose of Director of
17     Deerbrook?
18           A.    I believe at the time my mom had found
19     out something about this type of thing, probably
20     through David, and the original concept was to
21     create, for lack of a better description, a church
22     organization where she could do like giving stuff,
23     helping people out.
24                 To my knowledge, after it was filed, I
25     remember driving with her to go file it.  We didn't
```

Patrick Shannon                                    July 25, 2017

Page 77

1    know what you did with it or how to do anything with

2    it, so it set in a file and to my knowledge there's

3    never been anything done with it past its original

4    creation and file date.

5              Q.    Is Sharon Robertson your mother?

6              A.    She is.

7              Q.    Who is Glenn Stoll?

8              A.    Don't really know.  I assume he's a

9    friend of David's.  He's the one that I think

10   probably created this.  Speculation on my part.

11             Q.    How did your mother know David Gould?

12             A.    Probably because I introduced her to

13   him.

14             Q.    When was that?

15             A.    It would be the early '90s after '91,

16   '92, somewhere in there.  This was created in '96, so

17   somewhere prior to that and after me meeting David.

18             Q.    What was your role as Director of

19   Deerbrook?

20             A.    By the paperwork, I was the secretary.

21             Q.    Did you ever do any work on behalf of

22   Director of Deerbrook?

23             A.    I don't think Director of Deerbrook

24   ever did any work.

25             Q.    On the first page of Exhibit-13, down

Patrick Shannon                                    July 25, 2017

Page 78

1    at the bottom there, the bottom paragraph that says,

2    "Know all men by these presents that Sharon Robertson

3    is the duly appointed and qualified director

4    (overseer) of Deerbrook DBA 3R Industries."

5             A.    Uh-huh.

6             Q.    Did Director of Deerbrook do business

7    as 3R Industries?

8             A.    Again, I don't think Deerbrook did any

9    business.  Her company was 3R Industries and she was

10   making money.  You've seen, I think maybe you took

11   copies, or not, of the one bank statement -- or not

12   bank statement, corporation statement, financial

13   statement.  She was making money and she wanted to

14   find a way that she could donate money, and I think

15   this is how she was going to try to do that.

16            Q.    Do you know why in 2000, Director of

17   Deerbrook issued to Baycor Development three checks

18   totalling $10,000?

19            A.    No.  I'd like to see those.  I have no

20   idea.

21            Q.    Were you aware that Director of

22   Deerbrook did that, paid Baycor Development $10,000?

23            A.    I would have to speculate that maybe

24   David -- I don't know how that happened.  I'd have to

25   see the documents.  I don't know.

Patrick Shannon                                          July 25, 2017

Page 79

```
 1                    (Exhibit-14 marked.)

 2                    MR. LUKOFF:  Can we go off the record

 3      to review this document?

 4                    MR. BUTLER:  Yes.

 5                    (Discussion off the record.)

 6                    MR. BUTLER:  Back on the record.

 7            Q.    Have you seen Exhibit-14 before?

 8            A.    Yeah, because I have it in my

 9      possession.  I brought it to you.

10            Q.    Do you know why this was sent to

11      Director of Deerbrook, Patrick Shannon, 5353 Olson

12      Road?

13            A.    I'm pretty sure my mother, Sharon

14      Robertson, had given money and if I -- I may not have

15      it all together here, but she got into something with

16      First American Bank, like it was a tribal bank of

17      some kind, and she put money, or was told if she

18      invested this, she would get that.  And in the end,

19      she ended up with nothing and didn't get her money

20      back.

21                    And during their investigation,

22      Department of Justice's investigation, I'm pretty

23      sure this is them trying to get her her money back.

24      I don't remember if she ever got her money back.

25            Q.    Do you know why this would have been
```

Patrick Shannon                                    July 25, 2017

Page 80

1    sent to you?

2              A.    If it would have been wired to me?

3              Q.    No, why this letter would have been

4    sent to you.

5              A.    Probably because I was secretary and I

6    tried to do everything she wanted me to do.  The

7    other documents, the supporting documents as to why

8    the money went out, I don't know where those are or

9    what they would look like.

10                   So, you know, she lives in Canada, she

11   was a Canadian citizen.  So she was having me

12   probably take her money and send it.  And then when

13   the lawsuit came against these people, her name or

14   this organization, Director of Deerbrook, was in the

15   investment there and they tried to get her money back

16   to her.

17             Q.    Do you know who Owen K. Stephenson is?

18             A.    I do not.  I can go look the court case

19   up, but I don't remember who he is.

20             Q.    Do you know who Ronald G. Sparks is?

21             A.    Not specifically, no, I do not know.

22             Q.    You are familiar with 3R Industries?

23             A.    I am.

24             Q.    That's your mother's company?

25             A.    Yeah, it's my mom's company, yeah, what

Patrick Shannon                                    July 25, 2017

Page 81

1    it was, yeah.

2              Q.    When did she start it?

3              A.    I think in '89.  I think that's what

4    the document there says.

5              Q.    Did you have any role at 3R Industries?

6              A.    Everything from bottle washer to chief

7    gopher.

8              Q.    You had said that you worked for 3R

9    Industries in the early '90s?

10             A.    Yeah, anything she wanted me to do to

11   help her get product out the door, if she wanted me

12   to go help her with trade shows, I would go do that,

13   whatever she wanted me to do.  It was her company.

14             Q.    Did you earn income from 3R Industries?

15             A.    That was a huge bone of contention.

16   No.

17             Q.    Was David Gould associated with 3R

18   Industries?

19             A.    Inasmuch as he knew my mom owned it,

20   no.  I think he probably initially -- you know, if

21   you look back on it, he probably looked at it as

22   here's a lady who has a company with money and he

23   would like to plunder that.

24             Q.    Do you know who Marilyn Majeske is,

25   M-A-J-E-S-K-E?

Patrick Shannon                                    July 25, 2017

Page 82

1          A.    Not off the top of my head, no.    I
2    don't.
3          Q.    Are you familiar with Freedom
4    Ministries International?
5          A.    No.
6          Q.    Do you know who Thomas Fisher is?
7          A.    No.
8          Q.    Are you familiar with Whatcom Electric
9    and Plumbing?
10         A.    Absolutely.
11         Q.    What is that?
12         A.    Whatcom Electric, I don't know about
13   the plumbing part, Whatcom Electric rebuilds starters
14   and stuff in Bellingham.   Whatcom Electric and
15   Plumbing I think is probably a subcontractor that
16   probably does electric and plumbing.
17         Q.    Do you know if David Gould ever worked
18   for Whatcom Electric or Whatcom Electric and
19   Plumbing?
20         A.    I don't know, no.
21         Q.    Do you know who John Meenk, M-E-E-N-K,
22   is?
23         A.    No.
24         Q.    Do you know why Whatcom Electric and
25   Plumbing would have paid Director of Excalibur

Patrick Shannon                                        July 25, 2017

Page 83

1    $13,241?

2              A.    Not even close, no.

3              Q.    Are you familiar with Pacific Rim

4    Trading?

5              A.    I've heard David mention it, but only

6    inasmuch as it was probably a name drop of an

7    investment trading company.  I mean, I've heard the

8    name.

9              Q.    Are you familiar with Canvasback

10   Systems?

11             A.    Absolutely.  I think I brought that

12   with me.

13             Q.    Before getting to the document, can you

14   tell me how you're familiar with that?

15             A.    I think it was one of David's

16   businesses.  I mean, I know it was one of David's

17   businesses.  I can't remember exactly what it did.

18             Q.    How do you know it was one of his

19   businesses?

20             A.    Because he talked about it and I found

21   it in a pile of crap that I have that's his.

22                   (Exhibit-15 marked.)

23                   MR. LUKOFF:  Can we go off the record?

24                   MR. BUTLER:  Sure.

25                   (Discussion off the record.)

Patrick Shannon                                    July 25, 2017

Page 84

1                    MR. BUTLER:  Back on the record.

2          Q.   Do you recognize Exhibit-15?

3          A.   Inasmuch as it was in one of the

4    documents I brought you, yes.

5          Q.   Do you know what it is?

6          A.   By it's face, it says it's an agreement

7    and contract.  About what and to who, I don't know.

8          Q.   On the first page of Exhibit-15, do you

9    recognize the signatures at the bottom?

10         A.   No.

11         Q.   Look at the second page.

12         A.   I bet on the first page, the first

13   party, the second first party looks like it's

14   probably Steven Duke, who is on page 2, maybe.  I

15   can't tell if the first signature looks like a Victor

16   Perry.

17         Q.   Do you know who Steven Duke is?

18         A.   I don't know who either one of them

19   people are.

20         Q.   On the second page at the top, does

21   that look like David Gould's signature?

22         A.   That is David Gould's signature.

23         Q.   You said that Canvasback Systems was

24   one of David Gould's entities?

25         A.   Yes.

Patrick Shannon                                            July 25, 2017

Page 85

1          Q.    So he owned the entity or he worked for

2    the entity?

3          A.    I'm pretty sure if you were to get him

4    to tell the truth, he owned it.

5                (Exhibit-16 marked.)

6          Q.    Let's take a look at what's been marked

7    as Exhibit-16.

8          A.    Uh-huh.

9          Q.    Have you seen this before?

10         A.    Only inasmuch as it was in the file

11   folder I brought you.

12         Q.    Do you have any idea -- well, were you

13   involved in Brookline Properties sending this check

14   to US Home Loans in August of 1998?

15         A.    I'd have to do a timeline on all them

16   documents I signed to find out if I was even part of

17   it then, but if I was part of it, me touching the

18   check is probably handing it across a table to

19   somebody when somebody give it to me.

20         Q.    Do you know why Brookline Properties

21   would have paid $1,075.48 to US Bank Home Loans in

22   1998?

23         A.    No, no.  It's about the right amount of

24   money for a loan payment.  I don't know if there's

25   any of the loans that are in them documents that are

Patrick Shannon                                           July 25, 2017

Page 86

1      of the same date.  I have no idea.

2                 Q.   You don't know if that was a mortgage

3      payment?

4                 A.   I do not know.

5                      (Exhibit-17 marked.)

6                 Q.   Take a look at what's been marked as

7      Exhibit-17.  Do you recognize this document?

8                 A.   Same as the last document.  It was in

9      the file folder that I brought you.

10                 Q.   But you don't know what it's about?

11                 A.   I do not know what it's about, no.

12                 Q.   Up at the top right it says, "Date

13      prepared," and it looks like 10-18-99?

14                 A.   It does.

15                 Q.   At that time were you familiar with

16      Brookline Properties having anything to do with

17      foreclosure?

18                 A.   Not specifically, no, I don't remember

19      a foreclosure.

20                 Q.   Then --

21                 A.   To my knowledge, everything was trying

22      to improve the Shauna short plat.

23                      MR. LUKOFF:  May we go off the record?

24      I'd like to speak to my client for a moment.

25                      MR. BUTLER:  Yes.

Patrick Shannon                                    July 25, 2017

Page 87

 1                    (Exhibit-18 marked.)

 2                    (Discussion off the record.)

 3          Q.    Let's take a look at what's been marked

 4    as Exhibit-18.

 5          A.    Okay.

 6          Q.    Have you seen these receipts before?

 7          A.    I've seen these receipts in the file

 8    folder I brought today.  I don't know what they're

 9    for.  Obviously by reading them, they're US Home

10    Loans.  Not my handwriting.

11          Q.    Do you know whose handwriting that is

12    on these?

13          A.    I can only speculate that it's most

14    likely David's.  I don't think it would be Jane's.

15    It could have been Jane's.  It's not mine.

16          Q.    Do you know why in December of 1998

17    Brookline Properties would have sent these money

18    orders to US Bank Home Loans?

19          A.    You've got Exhibit-16 here, with a

20    total of a 1,075.48 and you have three money orders

21    that total 1,075.48.

22          Q.    So it looks like it might be for the

23    same type of payment?

24          A.    It might be for the same thing.  I

25    think Exhibit-16 is the receipt for Exhibit-18.

Patrick Shannon                                    July 25, 2017

1          Q.    Except they're different dates, but --

2          A.    Yeah, you know, August 13, the bank

3    sending that August 13th, I don't know -- I mean,

4    that's just the thing that I noticed.

5          Q.    Okay.

6                (Exhibit-19 marked.)

7          Q.    Take a look at what's been marked as

8    Exhibit-19.

9          A.    Look, that's the same amount.

10         Q.    Have you seen these before?

11         A.    They came in the same envelope as the

12   previous ones.  They sum total the same as the

13   previous check cashing store stuff, money orders.  I

14   don't even know who they're to because they're not

15   filled out.  I don't know.

16         Q.    But you don't recall having anything to

17   do with Western Union money orders for Brookline

18   Properties?

19         A.    I do not remember.  I remember he did a

20   lot of stuff with money orders.

21         Q.    David Gould?

22         A.    David, yeah, I remember doing David

23   doing a lot of stuff with money orders.  It wouldn't

24   be unknown, I guess it's possible I could have stuck

25   something in an envelope for him and put a stamp on

Patrick Shannon                                      July 25, 2017

Page 89

1    it.

2                Q.    Okay.

3                      (Exhibit-20 marked.)

4                Q.    Take a look at what's been marked as

5    Exhibit-20.  Have you seen this before?

6                A.    It again came in the documents I

7    brought you.  I don't know who PNC MNT is, but that

8    the Jane Polinder's name.

9                Q.    Do you know why Jane Polinder might be

10   sending $700 to PNC something?

11               A.    Probably under the direction of David.

12               Q.    But you don't have any independent

13   knowledge of that?

14               A.    I don't have any independent knowledge,

15   no, of why that would happen.

16                     (Exhibit-21 marked.)

17               Q.    Please take a look at what's been

18   marked as Exhibit-21.  Have you seen this before?

19               A.    I brought it with the documents that I

20   provided.  It was in there I think as probably one of

21   the tax notices, property tax notices that were in

22   the envelopes still.

23               Q.    The property tax notice for 2450

24   Thornton Street?

25               A.    Right.

Patrick Shannon                                      July 25, 2017

Page 90

1              Q.    In 2003, did you have any role in

2    paying the property tax for that property?

3              A.    Inasmuch as I knew it had to be paid

4    and he was going to lose the property if he didn't

5    pay the taxes, I didn't have access to any money to

6    pay the taxes, so it would be up to him to have done

7    it.

8              Q.    By "him" you mean David Gould?

9              A.    David Gould, yeah.

10             (Exhibit-22 marked.)

11             Q.    Please take a look at what's been

12   marked as Exhibit-22.

13             A.    Okay.

14             Q.    Have you seen this before?

15             A.    It came with the documents I brought

16   you.  It's got my name on it.

17             Q.    On the first page of Exhibit-22 --

18             A.    Right.

19             Q.    -- this says, "Patrick Shannon,

20   Brookline Properties, 5353 Olson Road."

21             Again, that is your address?

22             A.    That is my address.

23             Q.    Do you recall receiving this letter?

24             A.    I don't recall receiving it.  The topic

25   of the letter is about an easement from Puget Sound.

Patrick Shannon                                    July 25, 2017

                                                        Page 91

1    I remember he had to put up street lights.

2              Q.   David Gould?

3              A.   David Gould, yeah, to finish his

4    improving of the lots there, the Shauna short plat.

5              Q.   Do you know why this was sent to you?

6              A.   Oh, no doubt that David talked to them

7    and gave my name and address.  That's the easiest way

8    for me to get it and stick it in a file folder.

9              Q.   Were you involved in these emails at

10   all that pertained to the easement?

11             A.   Not in any way of the planning or the

12   paying for or anything.  I do remember the

13   conversation, it being one of the things that was

14   holding up the improvements of the property.

15                  (Exhibit-23 marked.)

16             Q.   Please take a look at what's been

17   marked as Exhibit-23.  Have you seen this before?

18             A.   It came from the documents that I

19   brought to you today.  I signed it in the bottom

20   right.

21             Q.   Do you recall signing this on May 3,

22   2006?

23             A.   No.  I wish my memory was that good.

24             Q.   Do you recall Jane Polinder obtaining a

25   loan from Brookline Properties for $5,000?

Patrick Shannon                                    July 25, 2017

```
 1            A.   I can imagine that this conversation
 2   happened in David's house.  The actual transaction
 3   and the money moving, I have no assurance or
 4   knowledge of.  I can imagine it happened.  I don't
 5   remember.  Having no control over the money, I don't
 6   know.
 7            Q.   Did you apply for an MYICIS debit card
 8   or comparable card and place $5,000 on the card for
 9   Jane Polinder's use?
10            A.   I imagine what would have happened is
11   David would have had an application for MYICIS.  I
12   don't know what that is, and he would have had
13   whatever funds' ability to pay for that.  And if
14   there's a signature on an application for a debit
15   card, it may be mine, but David would have funded it.
16   I don't remember ever -- again, I never had money
17   access here.
18            Q.   Okay.
19            A.   So what that is, I don't know what
20   MYICIS is.
21            MR. BUTLER:  Mr. Colvin, do you have
22   any questions for Mr. Shannon?
23            MR. COLVIN:  Could we take a quick
24   break?
25            MR. BUTLER:  Sure.
```

Patrick Shannon                                           July 25, 2017

Page 93

```
 1                    (Brief recess.)

 2                    MR. BUTLER:  Back on the record.

 3

 4                 E X A M I N A T I O N

 5  BY MR. COLVIN:

 6         Q.   My name is John Colvin.  I'm the

 7  attorney representing Jane Polinder and I just had a

 8  couple of follow-up questions.

 9         A.   Okay.

10         Q.   When you agreed to take the role of

11  trustee of the Brookline trust, what was your

12  understanding what that trust was?

13         A.   My understanding was that Jane and the

14  children were the beneficiaries and it was supposed

15  to be my purpose to make sure that the trust assets

16  were retained for the beneficiary of the trustees --

17  or for the beneficiary of the beneficiaries.

18         Q.   And what did you understand the trust

19  assets were?

20         A.   The Shauna short plat, the house and

21  the lots that were around the house.

22         Q.   Were you ever aware that there may have

23  been other property or money in the trust?

24         A.   No.

25         Q.   You indicated at some point you became
```

Patrick Shannon                                    July 25, 2017

Page 94

1    concerned that David was not acting correctly with

2    respect to the trust.  What made you feel that way?

3           A.   Well, when I first started this, I

4    didn't know what a trustee was supposed to be, and

5    over time, I felt that he was not forthcoming with

6    what his role should have been.  If he wanted a

7    trustee, he should have let me have the power to be a

8    trustee, but he never let me have the power.  So my

9    understanding was that I was supposed to be able to

10   retain stuff for the benefit of the beneficiaries,

11   but I was unable to do so.

12          Q.   Did you ever consider attempting to

13   enforce what you understood might be your rights in

14   that regard?

15          A.   Of course, but I didn't have the money

16   to do so and he had access to all the cash in the

17   trust so there's no way I could have litigated

18   anything.  So my only option was to tell him to find

19   somebody else because I couldn't do it no more.  It

20   just didn't seem like it was to the benefit of the

21   beneficiaries.

22          Q.   The reason you couldn't do it, did it

23   have to do with potential exposure on your part to

24   the beneficiaries?

25          A.   Yeah, I mean, the beneficiaries were

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com      206.622.6661 * 800.657.1110  FAX: 206.622.6236

Patrick Shannon                                    July 25, 2017

Page 95

1    going to end up losing because he was going to flush

2    all the funds out of this thing and I didn't have any

3    control over the funds.  I never did.  He wouldn't

4    give it to me.

5              MR. COLVIN:  Okay.  That's really all I

6    had.  Any follow-up?

7

8                   E X A M I N A T I O N

9    BY MR. BUTLER:

10             Q.  So you started as the trustee,

11   according to one of the documents we looked at, in

12   May of 1998 and you continued through at least 2009,

13   it appears; does that sound right?

14             A.  Well, 2009, there were a couple of

15   documents filed, I don't think -- well, maybe at that

16   particular time the name on that document was

17   somebody else, but I'm pretty sure it was prior to

18   that I had quit working for him.

19             Q.  About how long prior to that?

20             A.  I don't know specifically, but a couple

21   of years prior at least.  I pretty much cut him off.

22   He wasn't even allowed to come to my house because

23   every time he showed up, it cost me time.

24             Q.  You did file these documents in 2009?

25             A.  I did.

Patrick Shannon                                    July 25, 2017

Page 96

1                  MR. BUTLER:  I have no other questions.

2    Do you have questions you want to put on the record?

3                  MR. LUKOFF:  I do.  It's just to

4    reiterate and to clarify.

5

6                  E X A M I N A T I O N

7    BY MR. LUKOFF:

8            Q.   So when you said that you did not

9    believe you were still the trustee in 2009, you --

10   well, you didn't say the word trustee, but is that

11   what you meant?

12           A.   Absolutely.

13           Q.   Okay.  Filing the documents in 2009,

14   your purpose, you were no longer trustee but why did

15   you file the documents again?  You said before, but

16   let's just clarify this.

17           A.   To try to put more distance between me

18   and David, anything to get him out of my hair.

19           Q.   Okay.  So get out of your hair is

20   getting a new trustee who was not you?

21           A.   Stop asking me to do things.  Okay,

22   I'll file that for you, but leave me alone.  Anybody

23   can file paperwork.

24           Q.   Okay.  You had mentioned that there was

25   some contention between you and your wife around

Patrick Shannon                                      July 25, 2017

1   this.  Can you elaborate on that a little bit?

2           A.   Yeah, pretty much.  He spent so much of

3   my time to his benefit, that I was missing time to my

4   wife's benefit.  So there was quite -- for a couple

5   of years quite a few arguments over me wasting time

6   dealing with David.

7           Q.   Did your relationship with David cost

8   you money?

9           A.   In that I didn't get paid and in that I

10  didn't gain anything from it.  So directly?  I don't

11  think I gave him anything cash-wise.

12          Q.   But he never paid you --

13          A.   He never paid me anything.

14          Q.   -- for the time you --

15          A.   No.

16          Q.   Okay.

17          MR. LUKOFF:  I think those are all the

18  questions I have.

19          MR. BUTLER:  I just have a couple more

20  now.

21               E X A M I N A T I O N

22  BY MR. BUTLER:

23          Q.   Did you ever resign as trustee of

24  Brookline Properties?

25          A.   I'm pretty sure I wrote him an email or

Patrick Shannon                                           July 25, 2017

Page 98

1    a letter of some kind.  I can't remember doing that,

2    but I'm pretty sure there was absolutely a verbal

3    harsh conversation that occurred.

4              Q.   With David Gould?

5              A.   With David about leaving me the hell

6    alone and don't come at me anymore with this stuff.

7              Q.   Is there anything specific that

8    precipitated that?

9              A.   His absolute inability to put anybody

10   other than himself first.  I was supposed to be

11   helping protect his wife and his kids, and everything

12   he did was to David's benefit.

13             Q.   But you continued as trustee for

14   several years, so I'm just wondering if there was a

15   specific event that led you to decide not to do it

16   anymore?

17             A.   Just a culmination of this

18   (indicating).  You know, I'm supposed to be in

19   charge, and I was not in any way in charge.  It

20   became more and more of a bone of contention with my

21   wife that I was nothing more than David's patsy.  He

22   needed somebody to sign a piece of paper and I was

23   dumb enough to go do it.

24             Q.   When was the last time you spoke with

25   David Gould?

Patrick Shannon                                    July 25, 2017

1          A.    I don't know.  It's been a long time

2    ago.

3          Q.    Over five years ago?

4          A.    Yeah.  It's been a long time, like well

5    over five years.  I don't know exactly.  It's been a

6    long time.

7          Q.    Was the last time you spoke with him in

8    person or over the phone?

9          A.    I think the last time I probably spoke

10   to him it was on the phone, as he probably called me

11   from out of the country someplace.  And I have a

12   vague recollection of him wanting to get ahold of his

13   daughter, Malaya, and would I help him do it and the

14   answer was no.

15         Q.    Do you know his children?

16         A.    I knew them pretty well at the very

17   beginning, in the first probably six or eight or ten

18   years of their life, because they were there all the

19   time, but now I probably wouldn't recognize them if

20   they were in the same room with me.

21         Q.    Have you communicated with Mr. Gould

22   via email within the last five years?

23         A.    I do not believe so, no.

24         Q.    When was the last time you saw him

25   physically?

Patrick Shannon                                    July 25, 2017

Page 100

```
 1            A.   He was going to Canada, five, six,
 2    seven years ago, crossing the border.  He was going
 3    to go north.  I don't know where he was going to go
 4    there.  I think -- I don't know.  I don't know where
 5    he was going.
 6            Q.   When was the last time you spoke with
 7    Jane Polinder?
 8            A.   About two months ago.  She came by,
 9    called on the phone and wanted to see if I had time
10    for her to come see if there was any more stuff at my
11    house, any more David stuff.
12            Q.   Did she tell you why she was looking
13    for those documents?
14            A.   She said that she was the subject of a
15    lawsuit and she needed to find anything that was of
16    David's.  And having no knowledge that this was going
17    to happen, I went and helped her dig up everything I
18    could find.
19                 MR. BUTLER:  Okay.  Anything else?
20                 MR. COLVIN:  No.
21                 MR. BUTLER:  We're done.
22                 THE REPORTER:  Signature?  Do you want
23    to read and sign?
24                 MR. LUKOFF:  Yeah, I would like to.
25                 (Deposition concluded at 12:31 p.m.)
```

Patrick Shannon                                          July 25, 2017

                                                        Page 101

1                    S I G N A T U R E

2

3

4

5    I declare under penalty of perjury under the laws of

6    the State of Washington that I have read my within

7    deposition, and the same is true and accurate, save

8    and except for changes and/or corrections, if any, as

9    indicated by me on the CHANGE SHEET flyleaf page

10   hereof.  Signed in...............WA on the......day

11   of................., 2017.

12

13

14

15                    ........................

16                    PATRICK SHANNON

17                    Taken: July 25, 2017

18

19

20

21

22

23

24

25

Patrick Shannon                                          July 25, 2017

1                      C E R T I F I C A T E

2

3    STATE OF WASHINGTON      )ss.

4    COUNTY OF KING           )

5

6

7    I, Margaret Walkky, the undersigned Registered Merit
     Reporter and an officer of the Court for the State of
8    Washington, hereby certify that the foregoing
     deposition upon oral examination of PATRICK SHANNON
9    was taken before me on July 25, 2017 and transcribed
     under my direction;

10
     That the witness was duly sworn by me pursuant to RCW
11   5.28.010 to testify truthfully; that the transcript
     of the deposition is a full, true, and correct
12   transcript to the best of my ability; that I am
     neither attorney for, nor a relative or employee of,
13   any of the parties to the action or any attorney or
     counsel employed by the parties hereto, nor
14   financially interested in its outcome;

15   I further certify that in accordance with CR 30(e),
     the witness was given the opportunity to examine,
16   read, and sign the deposition, within 30 days, upon
     its completion and submission, unless waiver of
17   signature was indicated in the record.

18   IN WITNESS WHEREOF, I have hereunto set my hand and
     seal this date: August 1, 2017.

19

20

21

22   ...................................
     Margaret Walkky, Registered Merit Reporter
23   Certified Court Reporter No. 2540 License
     expires July 18, 2018

24

25